UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 11-23841-CIV-ROSENBAUM/SELTZER

IN RE:

M/V SEABOARD SPIRIT
SEABOARD SPIRIT LTD as
Owner and SEABOARD MARINE LTD as
Owner *Pro Hac Vice* of the M/V SEABOARD
SPIRIT, for exoneration from or limitation
of liability,

      Petitioners.
_____/

**ORDER GRANTING PETITIONERS' MOTION FOR SUMMARY JUDGMENT, AND
DENYING RESPONDENTS/CLAIMANTS' MOTION FOR SUMMARY JUDGMENT**

This matter is before the Court on Petitioners' Motion for Summary Judgment Pursuant to its Claim for Exoneration Against the Claims of the Claimants [D.E. 88] of Petitioners Seaboard Spirit, Ltd., Seaboard Marine, Ltd., Seaboard Ship Management, Inc., and Seaboard Marine of Florida, Inc., and the Motion for Summary Judgment on Petitioners' Amended Petition for Exoneration or Limitation of Liability [D.E. 97] of Respondents/Claimants Antwon Hyman and Sieshia Nesha Reid, as personal representatives of the estate of Ossie Hyman. For the reasons set forth below, the Court grants Petitioners' Motion for Summary Judgment and denies Claimants' Motion for Summary Judgment.

*MATERIAL FACTS*

On May 3, 2011, crew members of the M/V *Seaboard Spirit* secured cargo onto the ship as it was docked at the Port of Nassau in the Bahamas. D.E. 97-1 at 16-17. The ship sailed to the Port of Miami, where the stevedoring company Eller-ITO was in charge of discharging the cargo. D.E.

112 at 2.

Ossie Hyman was employed as a longshoreman by Eller-ITO during the May 4, 2011, discharge operations at the Port of Miami. D.E. 33 at 2, ¶ 8; D.E. 112 at 2. Hyman's role during discharge operations was that of "striker," with the responsibility to ensure that the crew was safe and that the cargo was in good order and condition to be removed. D.E. 97-6 at 30. In particular, Hyman and the other longshoremen were to discharge a certain container and chassis, the rear of which was secured to the deck of the vessel by lashing chains. D.E. 97-2 at 106; D.E. 97-4 at 66.

One of these lashing chains remained affixed to both the chassis and the vessel, as a mule, attached to the front of the chassis, attempted to drive the container forward. D.E. 97-4 at 67-68; D.E. 97-6 at 42; D.E. 97-7 at 26. When the mule moved forward, the rear lashing chain caused the chassis to slide laterally, pinning Hyman to the bulkhead of the vessel and causing fatal injuries. D.E. 97-2 at 43-44; D.E. 97-4 at 121. The lashing chain was not released from the chassis until after the incident. D.E. 97-6 at 36, 43-44.

## PROCEDURAL BACKGROUND

Petitioners, the owners of the M/V *Seaboard Spirit*, brought this action for exoneration from or limitation of liability of the claims arising from the May 4, 2011, incident. D.E. 28. Claimants, as representatives of the estate of Ossie Hyman, thereafter filed their Claim against Petitioners for the wrongful death of Ossie Hyman. D.E. 33. Petitioners now move for summary judgment on their claim for exoneration from liability. D.E. 88. Claimants filed a cross-motion for summary judgment that argues that the Court should deny the Petitioner's claims of exoneration from or limitation of liability. D.E. 97.

## *SUMMARY JUDGMENT STANDARD*

Summary judgment is appropriate "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). An issue is genuine if "a reasonable trier of fact could return judgment for the non-moving party." *Miccosukee Tribe of Indians of Fla. v. United States*, 516 F.3d 1235, 1243 (11th Cir. 2008) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986)). A fact is material if it "might affect the outcome of the suit under the governing law." *Id.* (quoting *Anderson*, 477 U.S. at 247-48).

On a motion for summary judgment, the Court views the evidence, including all reasonable inferences drawn from it, in the light most favorable to the non-moving party and resolves all reasonable doubts against the movant. *Rioux v. City of Atlanta, Ga.*, 520 F.3d 1269, 1274 (11th Cir. 2008); *Johnson v. City of Mobile*, 321 F. App'x 826, 830 (11th Cir. 2009). The Court does not weigh conflicting evidence. *Skop v. City of Atlanta*, 485 F.3d 1130, 1140 (11th Cir. 2007), *reh'g and reh'g en banc denied*, 254 F. App'x 803 (11th Cir. 2007). Nor does the Court determine the credibility of witnesses. *Jones v. UPS Ground Freight*, 683 F.3d 1283, 1292 (11th Cir. 2012) (citation omitted). Upon discovering a genuine material dispute, the Court must deny summary judgment and proceed to trial. *Id.* at 1292.

The moving party shoulders the initial burden of showing the absence of a genuine issue of material fact. *Shiver v. Chertoff*, 549 F.3d 1342, 1343 (11th Cir. 2008). Once the moving party satisfies this burden, "the nonmoving party 'must do more than simply show that there is some metaphysical doubt as to the material facts.'" *Ray v. Equifax Info. Servs., L.L.C.*, 327 F. App'x 819, 825 (11th Cir. 2009) (quoting *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574,

586 (1986)). Instead, "the non-moving party 'must make a sufficient showing on each essential element of the case for which he has the burden of proof.'" *Id.* (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)). Accordingly, the non-moving party must produce evidence, going beyond the pleadings, and by his own affidavits, or by depositions, answers to interrogatories, and admissions on file, designate specific facts suggesting that a reasonable jury could find in his favor. *Shiver*, 549 F.3d at 1343.

Local Rule 56.1, S.D. Fla., further factors into this Court's consideration of a motion for summary judgment. Under Local Rule 56.1, a party moving or opposing summary judgment must submit a "statement of the material facts as to which it is contended that there does not exist a genuine issue to be tried or there does exist a genuine issue to be tried, respectively." S.D. Fla. L.R. 56.1(a). The rules require these statements be supported by "specific references" to evidence on the record. S.D. Fla. L.R. 56.1(a)(2). The Local Rules expressly caution, "All material facts set forth in the movant's statement filed and supported as required above will be *deemed admitted* unless controverted by the opposing party's statement, provided that the Court finds that the movant's statement is supported by evidence in the record." S.D. Fla. L.R. 56.1(b) (emphasis added). But even where an opposing party neglects to submit any alleged material facts in controversy, the court must still satisfy itself that the evidence on the record supports the uncontroverted material facts that the movant has proposed. *Reese v. Herbert*, 527 F.3d 1253, 1268-69, 1272 (11th Cir. 2008); *United States v. One Piece of Real Prop. Located at 5800 S.W. 74th Ave., Miami, Fla.*, 363 F.3d 1099, 1103 n.6 (11th Cir. 2004).

## *DISCUSSION*

This matter was filed as an action for exoneration from or limitation of liability by Petitioners, the owners of the M/V *Seaboard Spirit*, against the estate of Ossie Hyman pursuant to the Limitation of Liability Act, 46 U.S.C. §§ 30501-30512. D.E. 28 at 1. The Court conducts a two-step analysis in exoneration proceedings: "First, the court must determine what acts of negligence or conditions of unseaworthiness caused the accident. Second, the court must determine whether the shipowner had knowledge or privity of those same acts of negligence or conditions of unseaworthiness." *Hercules Carriers, Inc. v. Claimant State of Fla., Dept. of Transp.*, 768 F.2d 1558, 1563-64 (11th Cir. 1985) (quoting *Farrell Lines, Inc. v. Jones*, 530 F.2d 7, 10 (5th Cir. 1976)).

The claimant bears the initial burden to put forth evidence of the petitioner's negligence or unseaworthiness before the burden shifts to the petitioner to prove lack of knowledge or privity. *In re Complaint of Royal Carribean Cruises Ltd.*, 459 F. Supp. 2d 1284, 1288 (S.D. Fla. 2006) (citing *In re Royal Caribbean Cruises*, 55 F. Supp. 2d 1367, 1370 (S.D. Fla.1999)). If no evidence of the petitioner's negligence or contributory fault exists, the petitioner is entitled to exoneration. *Id.* But if there is evidence of negligence, the court determines whether limitation of liability is warranted. *Id.* (citing *Complaint of Sheen*, 709 F. Supp. 1123, 1128-29 (S.D. Fla.1989)).

Here, Claimants bring their claim for the wrongful death of Ossie Hyman in accordance with the provisions of § 905 of the Longshore and Harbor Worker's Compensation Act, 33 U.S.C. § 905. D.E. 33 at 3, ¶ 11. In 1972, Congress amended the Longshore and Harbor Worker's Compensation Act. Essentially, the amendments provided that, in exchange for an increase in the statutory benefits that injured longshoremen are entitled to receive from their employers, among other things, the liability of vessels was limited to liability for maritime-recognized negligence. *See Northeast Marine*

*Terminal Co. v. Caputo*, 432 U.S. 249, 261-262 (1977). As the Supreme Court explained, these amendments affected "fundamental changes" to longshoremen's actions against shipowners. *Howlett v. Birkdale Shipping Co., S.A.*, 512 U.S. 92, 97 (1994).

> First, [§ 905(b)] abolished the longshoreman's pre-existing right to sue a shipowner based upon the warranty of seaworthiness, a right that had been established in *Seas Shipping Co. v. Sieracki*, 328 U.S. 85, 66 S.Ct. 872, 90 L.Ed. 1099 (1946). Section 5(b) also eliminated the stevedore's obligation, imposed by *Ryan Stevedoring Co. v. Pan-Atlantic S.S. Corp.*, 350 U.S. 124, 76 S.Ct. 232, 100 L.Ed. 133 (1956), to indemnify a shipowner, if held liable to a longshoreman, for breach of the stevedore's express or implied warranty to conduct cargo operations with reasonable safety. See generally *Scindia Steam Nav. Co. v. De los Santos*, 451 U.S. 156, 165, 101 S.Ct. 1614, 1620-1621, 68 L.Ed.2d 1 (1981); G. Gilmore & C. Black, Law of Admiralty § 6-57, pp. 449-455 (2d ed. 1975) (hereinafter Gilmore & Black). Other sections of the 1972 amendments provided for a substantial increase in the statutory benefits injured longshoremen are entitled to receive from their stevedore-employers. See *Northeast Marine Terminal Co. v. Caputo*, 432 U.S. 249, 261-262, 97 S.Ct. 2348, 2356, 53 L.Ed.2d 320 (1977); Gilmore & Black § 6-46, at 411; Note, 13 Tulane Mar.L.J. 163, 163-164 (1988). The design of these changes was to shift more of the responsibility for compensating injured longshoremen to the party best able to prevent injuries: the stevedore-employer. See *Scindia Steam*, 451 U.S., at 171, 101 S.Ct., at 1624. Subjecting vessels to suit for injuries that could be anticipated and prevented by a competent stevedore would threaten to upset the balance Congress was careful to strike in enacting the 1972 amendments.

*Howlett*, 512 U.S. at 97.

Section 905(b) is the exclusive means by which a person injured due to the negligence of the vessel may bring an action against the vessel. *See Norfolk Shipbuilding & Drydock Corp. v. Garris*, 532 U.S. 811, 818 (2001). Under § 905(b), if the vessel employed the injured person to provide stevedoring services, "no such action shall be permitted if the injury was caused by the negligence of persons engaged in providing stevedoring services to the vessel." *Id.* The liability of the vessel

in these circumstances is based upon the negligence of the vessel, not upon "the warranty of seaworthiness or a breach thereof at the time the injury occurred." *Id.*

Though actions under § 905(b) are governed by principles of negligence and not seaworthiness, "maritime negligence actions are not necessarily to be governed by [negligence] principles applicable in nonmaritime contexts," such as assumption of risk and contributory negligence. *Scindia Steam Nav. Co., Ltd. v. De Los Santos*, 451 U.S. 156, 168 n.14 (1981). The "land-based principles [of the Restatement (Second) of Torts], 'while not irrelevant, do not furnish sure guidance' in maritime cases brought under §[905(b)]." *Howlett*, 512 U.S. at 100 (quoting *Scindia*, 451 U.S. at 168, n.14). In place of these land-based principles of negligence, the Supreme Court has interpreted the Longshore and Harbor Worker's Compensation Act to provide for "three general duties shipowners owe to longshoremen" working aboard their vessels. *Howlett*, 512 U.S. at 98.

> The first, which courts have come to call the "turnover duty," relates to the condition of the ship upon the commencement of stevedoring operations. *See* [*Scindia*, 451 U.S. at 167]. The second duty, applicable once stevedoring operations have begun, provides that a shipowner must exercise reasonable care to prevent injuries to longshoremen in areas that remain under the "active control of the vessel." *Ibid*. The third duty, called the "duty to intervene," concerns the vessel's obligations with regard to cargo operations in areas under the principal control of the independent stevedore. *See id.*, at 167-178, 101 S.Ct., at 1622-1623.

*Howlett*, 512 U.S. at 98. The three duties of the vessel as outlined in *Scindia* reflect Congress's intent "to make the vessel answerable for its own negligence and to terminate its automatic, faultless responsibility for conditions caused by the negligence or other defaults of the stevedore." *Scindia*, 451 U.S. at 168. Thus, injured longshoremen must prove the breach of at least one of these three

*Scindia* duties in order to show the negligence of the vessel.

### A. Applicability of *Scindia*

As a threshold matter, however, Claimants argue that the *Scindia* duties do not apply to Petitioners because employees of Petitioners acted as the loading stevedore during loading operations in the Port of Nassau, the Bahamas, before the M/V *Seaboard Spirit* arrived at the Port of Miami and the stevedore company Eller-ITO undertook discharge operations. D.E. 97 at 5-9; D.E. 112 at 4-14; D.E. 122 at 6-9. Claimants assert that the allegedly negligent loading of the chassis by Petitioners ultimately caused the injury to Hyman. *Id.* In response, Petitioners correctly note that the three counts in Claimants' Amended Claim allege only that Petitioners violated their three *Scindia* duties under § 905(b). D.E. 107 at 9 n.3.

A party may not raise new claims at the summary-judgment stage. *Gilmour v. Gates, McDonald & Co.*, 382 F.3d 1312, 1314 (11th Cir. 2004). "At the summary judgment stage, the proper procedure for plaintiffs to assert a new claim is to amend the complaint in accordance with Fed.R.Civ.P. 15(a)." *Id.* at 1315. For this reason alone, Claimants can neither survive a motion for summary judgement by invoking their new theory nor can Claimants prevail on their Motion for Summary Judgment under this new theory.

Moreover, even had Claimants pled in their Claim that § 905(b) and the *Scindia* duties do not govern this action, Claimants' Claim still would not survive a motion for summary judgment, nor could Claimants succeed on their Motion for Summary Judgment. Claimants' new theory seeks to avoid application of both § 905(b) and *Scindia*. But, as noted above, § 905(b) is the exclusive means by which an injured longshoreman can bring an action against the vessel on which he was injured. *Norfolk Shipbuilding & Drydock Corp.*, 532 U.S. at 818. Claimants cannot bring a

negligence action against a vessel outside of § 905(b). And, under § 905(b), a vessel's negligence must fall into one of the three *Scindia* categories to be actionable.

Nor do *Couch v. Cro-Marine Transp., Inc.*, 44 F.3d 319 (5th Cir. 1995), and *Grennan v. Crowley Marine Services, Inc.*, No. C05-1504, 2006 WL 623847 (W.D. Wash. Mar. 10, 2006), two cases on which Claimants rely, support Claimants' theory that they may proceed against the vessel outside the bounds of § 905(b). *Couch* concerned an injured discharging longshoreman's suit against the loading stevedore. *Couch*, 44 F.3d at 321. Unlike in this case, where the vessel loaded the cargo itself, the loading stevedore in *Couch* had no ownership interest in the vessel. Thus, the court concluded that § 905(b)—and *Scindia*'s interpretation of § 905(b)—did not apply to the action. *Id.* at 326. As a result, the court allowed the action against the loading stevedore company to proceed outside the bounds of the Longshore and Harbor Worker's Compensation Act. *Id.* In this case, however, the vessel itself—not an independent stevedoring company that is not governed by § 905(b)—loaded the vessel. Because § 905(b) provides the sole mechanism by which a claimant may seek compensation from a vessel for its alleged negligence, however, Claimants here may not seek compensation for the vessel's alleged negligence outside of § 905(b)'s framework.

*Grennan* is similarly inapposite. In *Grennan*, an injured longshoreman sued his corporate employer, who acted both as the shipowner and the stevedore company. *Grennan*, 2006 WL 623847, at *1. The court adopted the analyses of the circuit courts that have considered so-called dual-capacity employers who both employ the injured stevedore and who are the vessel. *See id.* at *4-6 (citing *Gravatt v. City of New York*, 226 F.3d 108, 115-20 (2d Cir. 2000); *Morehead v. Atkinson-Kiewit J/V*, 97 F.3d 603, 611 (1st Cir. 1996) (en banc); *Castrona v. Lykes Bros. S.S. Co.*, 758 F.2d 1025, 1033 (5th Cir. 1985); *Smith v. E. Seaboard Pile Driving*, 604 F.2d 789, 795 (2d Cir. 1979)).

As the *Grennan* Court explained, the dual-capacity analysis considers whether the vessel breached its *Scindia* duties of care while acting in its capacity as vessel or whether, instead, the vessel's employees—and, thus, the vessel as employer—who allegedly committed the negligent acts did so as employees performing longshoring acts. *Grennan*, 2006 WL 623847, at *4. In the first case, such claims must proceed under § 905(b), but in the second circumstance, because the vessel acts as the employer—as opposed to the vessel—such claims proceed under § 905(a), which applies to employer liability. Here, however, unlike the *Grennan* vessel, Petitioners never acted as Hyman's employer; instead, they loaded the cargo at issue in Nassau, and Hyman's employer—who was not one of Petitioners—was responsible for offloading the cargo. As a result, potential employer liability on the part of the vessel cannot exist here. Accordingly, this Court analyzes Claimants' claims against Petitioners under the three *Scindia* duties as alleged in Claimants' Amended Claim. D.E. 33.

### B. *Scindia* Duties

Petitioners argue that because they did not breach any of the three *Scindia* duties, they are entitled to exoneration as a matter of law. D.E. 88 at 7-17. For their part, Claimants contend that Petitioners breached all three *Scindia* duties, so they may not obtain exoneration from liability. D.E. 112 at 14-17. Below, the Court analyzes the parties' claims under each of the three *Scindia* duties.

#### 1. Turnover Duty

The turnover duty requires a vessel to "'exercise ordinary care under the circumstances' to turn over the ship and its equipment and appliances 'in such condition that an expert and experienced stevedoring contractor, mindful of the dangers he should reasonably expect to encounter, arising from the hazards of the ship's service or otherwise, will be able by the exercise of ordinary care' to carry on cargo operations 'with reasonable safety to persons and property.'" *Howlett*, 512 U.S. at 98

(quoting *Federal Marine Terminals, Inc. v. Burnside Shipping Co.*, 394 U.S. 404, 416-417 n.18 (1969)). The turnover duty "attaches only to latent hazards, defined in this context as hazards that would be neither obvious to nor anticipated by a competent stevedore in the ordinary course of cargo operations." *Howlett*, 512 U.S. at 99.

A corollary to this duty requires the vessel to warn the stevedore "'of any hazards on the ship or with respect to its equipment,' so long as the hazards 'are known to the vessel or should be known to it in the exercise of reasonable care,' and 'would likely be encountered by the stevedore in the course of his cargo operations[,] are not known by the stevedore[,] and would not be obvious to or anticipated by him if reasonably competent in the performance of his work.'" *Howlett*, 512 U.S. at 98-99 (alterations original) (quoting *Federal Marine Terminals*, 394 U.S. at 416-417 n.18). If a vessel does not have actual knowledge of a hazard, the duty to warn attaches "only if the exercise of reasonable care would place upon the shipowner an obligation to inspect for, or discover, the hazard's existence." *Id.* at 100 (citing *Kirsch v. Plovidba*, 971 F.2d 1026, 1029 (3d Cir. 1992)).

Petitioners argue that the lashing chain that remained affixed to the chassis was an open, obvious, and avoidable condition to which the turnover duty would not apply. D.E. 88 at 12-13. Claimants respond that "[w]hile the attached lashing chain may have been open and obvious," Petitioners' use of defective lever chain binders and the inadequate number of wheel chocks on the chassis and mule were latent hazards to which the turnover duty does apply. D.E. 112 at 15-16. They also claim that the turnover duty applies because lashing chains were not used on the front of the chassis, and the internal access ramp was too narrow for workers to perform their required services. D.E. 97 at 10.

Though some dispute may exist concerning how many lashing chains were attached on the

chassis during the voyage to Miami, *see* D.E. 117 at 3, the lack of chains affixed to the front of the chassis is not a latent condition that is neither open nor obvious. *Howlett*, 512 U.S. at 99. Similarly, unrebutted evidence of record shows that the longshoremen's procedure is to remove wheel chocks before signaling to the mule driver to move forward. D.E. 93-5 at 15. In this case, the record further reveals that some wheel chocks were indeed removed from beneath the chassis or mule before the incident. D.E. 93-4 at 45-46; D.E. 97-6 at 47-48. If, as Claimants contend, an insufficient number of wheel chocks had been affixed to the chassis or mule tires, that condition would not constitute a hazard that is latent to "expert and experienced" longshoremen. *Howlett*, 512 U.S. at 98. Nor does Claimant's evidence that "the area [on the ramp] between the container and the bulkhead (walkway) where the accident took place is *knowingly* an unsafe area," D.E. 97 at 10 (emphasis added), indicate that the hazard posed by this narrow walkway was latent.

Though Claimants baldly contend that Petitioners used "inadequate, dangerous, and/or defective lever chain binders," Claimants' Motion fails to point to any evidentiary support in the record for this notion. *Id.* While a report written by the marine surveyor and naval architect Hector Pazos after his visual inspection of the M/V *Seaboard Spirit* on October 3, 2011, does conclude that an "[i]nadequate, dangerous and/or defective lever chain binder (chain lashing) [was] utilized in securing the back of the chassis," D.E. at 97-5 at 18, the testimony of Hector Pazos reveals that the basis for this conclusion is nothing more than pure speculation. D.E. 97-4 at 93-99. In this regard, Pazos states that it is "common sense" that the longshoremen should have attempted to remove the final lashing chain because they removed all other lashing chains affixed to the chassis. *Id.* at 94-95. Therefore, Pazos concludes, the reason that the final lashing chain remained affixed was because the chain binders must have been defective so the longshoremen could not remove the chain. *Id.* at 94-

-12-

96. But, significantly, Pazos concedes that he is unaware of any testimony or other evidence showing that longshoremen attempted to release the final lashing chain before the accident but could not. *Id.* at 94. Though Claimants point to the testimony of the longshoremen working at the time of the accident to support the notion that they attempted to remove the lashing chain prior to the accident but were unsuccessful, D.E. 111 at 2, this testimony shows that attempts were made to release the chain *after* the accident, but not before it. *See* D.E. 97-6 at 36, 43-44.

Thus, the methodology used by Pazos to conclude that the chain binders were inadequate or defective consists of pure speculation, a methodology that does not satisfy *Daubert* and its progeny's reliability requirement. Therefore, it is inadmissible. *See United States v. Frazier*, 387 F.3d 1244, 1261 (11th Cir. 2004) (quoting *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 590 (1993)) ("[p]roposed [expert] testimony must be supported by appropriate validation—*i.e.*, 'good grounds,' based on what is known"); *McCorvey v. Baxter Healthcare Corp.*, 298 F.3d 1253, 1256 (11th Cir. 2002) ("*Daubert* requires that trial courts act as 'gatekeepers' to ensure that speculative, unreliable expert testimony does not reach the jury"). Evidence that is inadmissible, including testimony given during a deposition, cannot be considered on a motion for summary judgment. *Macuba v. Deboer*, 193 F.3d 1316, 1322-23 (11th Cir. 1999). Accordingly, Claimants have submitted insufficient evidence for the Court to be able to conclude that the lever chain binders were inadequate, dangerous, or defective. Claimants have therefore failed to show that Petitioners breached their turnover duty.

### 2. Active-Control Duty

The active-control duty is triggered once stevedoring operations have commenced and requires the shipowner to exercise reasonable care to prevent injuries to longshoremen in areas under

the "active control of the vessel." *Howlett*, 512 U.S. at 98 (quoting *Scindia*, 451 U.S. at 167). Thus, the vessel "may be liable if it actively involves itself in the cargo operations and negligently injures a longshoreman or if it fails to exercise due care to avoid exposing longshoremen to harm from hazards they may encounter in areas, or from equipment, under the active control of the vessel during the stevedoring operation." *Scindia*, 451 U.S. at 167.

Petitioners assert that no testimony or evidence indicates that they were actively involved in cargo operations at the time of the accident. D.E. 88 at 14. Claimants do not refute that Petitioners were not actively involved in the cargo discharge operations; instead, they contend that Petitioners had active control of the cargo-loading operations in the Bahamas and control of the design and construction of the incline ramp that they argue was too narrow. D.E. 97 at 10-11; D.E. 112 at 16-17. However, the active-control duty is applicable only "once stevedoring operations have begun," *Howlett*, 512 U.S. at 98, and the stevedoring operations at issue are those during which the plaintiff is injured. *See Green v. United States*, 418 F. App'x 862, 869 (11th Cir. 2011), *cert. denied*, __ U.S. __, 132 S. Ct. 817 (2011) (considering whether vessel had active control over the stevedoring operation during which plaintiff was injured); *Lampkin v. Liberia Athene Transp. Co., Ltd.*, 823 F.2d 1497, 1502-03 (11th Cir. 1987) (same). Thus, any control Petitioners may have had over operations in the Bahamas is irrelevant to the active-control duty analysis applicable in this case. Because Claimants do not argue that Petitioners had active control of the cargo operations during which Ossie Hyman's injuries took place, they do not show that Petitioners breached their active-control duty.

### 3. Duty to Intervene

The third and final *Scindia* duty, the duty to intervene, also applies after cargo operations have begun. *Howlett*, 512 U.S. at 98. Unlike the active-control duty, however, this duty "concerns

the vessel's obligations with regard to cargo operations in areas under the principal control of the independent stevedore." *Id.* (citing *Scindia*, 451 U.S. at 167-178). *Scindia* explained that "absent contract provision, positive law, or custom to the contrary . . . the shipowner has no general duty by way of supervision or inspection to exercise reasonable care to discover dangerous conditions that develop within the confines of the cargo operations that are assigned to the stevedore." *Scindia*, 451 U.S. at 172. As a result, the shipowner is not liable for "injuries caused by dangers unknown to the owner and about which he had no duty to inform himself" because the shipowner, "within limits, is entitled to rely on the stevedore, and owes no duty to the longshoremen to inspect or supervise the cargo operations." *Id.*

Under the active-control duty, a shipowner may be held liable if it has constructive knowledge of a hazard, but the shipowner must have *actual* knowledge of the hazard to be liable under the duty to intervene. *See Lampkin*, 823 F.2d at 1501. "In such a case, the shipowner has a duty to intervene to protect the longshoremen only if 'it becomes aware that the ship or its gear poses a danger to the longshoremen and that the stevedore is failing, unreasonably, to protect the longshoremen. . . .' *Id.* (quoting *Clark v. Bothelho Shipping Corp.*, 784 F.2d 1563, 1565 (11th Cir. 1986)). The Eleventh Circuit lists multiple factors that guide a district court's determination about whether a duty to intervene has arisen under the facts of the case: "whether the danger was open and obvious; whether the danger was located within the ship or ship's gear; which party created the danger or used the defective item and was therefore in a better position to correct it; which party owned or controlled the defective item; whether an affirmative act of negligence or acquiescence in the use of the dangerous item occurred; and whether the shipowner assumed any duty with regard to the dangerous item." *Roach v. M/V Aqua Grace*, 857 F.2d 1575, 1582 (11th Cir. 1988) (citing

*Casaceli v. Martech Intern., Inc.*, 774 F.2d 1322, 1328 (5th Cir. 1985)).

Petitioners assert that no evidence or testimony demonstrates that Petitioners had actual knowledge of any sort of dangerous condition either before or during the discharge operations under the control of the longshoremen. D.E. 88 at 15. In response, Claimants retort that Petitioners had actual knowledge of the allegedly inadequate lashing of the chassis, the alleged failure to use a sufficient number of chocks, and the allegedly defective and unsafe inclined ramp. D.E. 97 at 11-12; D.E. 112 at 17. But Claimants point to no evidence in the record as support for these assertions. *See id.*

As they did in their discussion of the active-control duty, Claimants here misapply the duty to intervene to circumstances that occurred prior to the commencement of the discharge operations. The duty to intervene applies when hazards become apparent only after the ship has already been turned over to the stevedore. *See Scindia*, 451 U.S. at 175  (discussing shipowner's duty to intervene when equipment malfunction became apparent after ship had been turned over to stevedore); *see also Howlett*, 512 U.S. at 100 (noting that *Scindia* "turned not upon the turnover duty but upon the scope of the vessel's duty to intervene once cargo operations have begun"); *Lampkin*, 823 F.2d at 1501 ("*Scindia* made it clear that once an owner has relinquished complete control of the vessel to the stevedore, primary responsibility for the safety of the longshoremen lies with the stevedore. However, if the shipowner learns of an apparently dangerous condition that presents an unreasonable risk or harm to the longshoremen, it has a duty to intervene and remove the hazard").

Hazards that existed prior to the ship's turnover, on the other hand, fall under the previously discussed turnover duty's requirement that shipowners warn of latent hazards that are "known to the vessel or should be known to it in the exercise of reasonable care." *Howlett*, 512 U.S. at 98-99

(quoting *Federal Marine Terminals*, 394 U.S. at 416-417 n.18). As discussed above, Petitioners did not breach their turnover duty. Because Claimants do not allege that Petitioners had actual knowledge of a hazard that arose after the ship's turnover, Claimants' contention that Petitioners breached their duty to intervene also fails.

Claimants have not provided evidence that Petitioners breached their *Scindia* duties, and Petitioners are therefore entitled to exoneration from the claims of Claimants. *In re Complaint of Royal Carribean Cruises Ltd.*, 459 F. Supp. 2d at 1288 (citing *In re Royal Caribbean Cruises*, 55 F. Supp. 2d at 1370).

## *CONCLUSION*

For the foregoing reasons, the Motion for Summary Judgment Pursuant to its Claim for Exoneration Against the Claims of the Claimants [D.E. 88] of Petitioners Seaboard Spirit, Ltd., Seaboard Marine, Ltd., Seaboard Ship Management, Inc., and Seaboard Marine of Florida, Inc., is **GRANTED** and the Motion for Summary Judgment on Petitioners' Amended Petition for Exoneration or Limitation of Liability [D.E. 97] of Respondents/Claimants Antwon Hyman and Sieshia Nesha Reid is **DENIED.** All pending motions are **DENIED AS MOOT.** The Clerk is directed to **CLOSE** this matter.

**DONE and ORDERED** at Fort Lauderdale, Florida, this 6th day of September 2013.

_____
ROBIN S. ROSENBAUM
UNITED STATES DISTRICT JUDGE

Copies to:
The Honorable Barry S. Seltzer
Counsel of record