IN RE:

M/V SEABOARD SPIRIT
SEABOARD SPIRIT LTD as
Owner and SEABOARD MARINE LTD as
Owner *Pro Hac Vice* of the M/V SEABOARD
SPIRIT, for exoneration from or limitation
of liability,

        Petitioners.

_____/

## ORDER GRANTING IN PART MOTION TO ALTER OR AMEND JUDGMENT

This matter is before the Court on the Motion to Alter or Amend Judgment [ECF No. 136] of Respondents/Claimants Antwon Hyman and Seisha Neshay Reid, as Personal Representatives of the Estate of Ossie Hyman. Claimants move the Court to alter or amend the Final Judgment Dismissing Claimants' Claims Against Petitioners With Prejudice [ECF No. 135]. For the reasons set forth below, the Court grants in part the Motion to Alter or Amend Judgment.

### *BACKGROUND*

On May 3, 2011, crew members of the M/V *Seaboard Spirit* secured cargo onto the ship as it was docked at the Port of Nassau in the Bahamas. ECF No. 97-1 at 16:1-17:9. The ship sailed to the Port of Miami, where the stevedoring company Eller-ITO was in charge of discharging the cargo. ECF no. 112 at 2.

Ossie Hyman was employed as a longshoreman by Eller-ITO during the May 4, 2011, discharge operations at the Port of Miami. ECF No. 33 at 2, ¶ 8; D.E. 112 at 2. Hyman's role during discharge operations was that of "striker," with the responsibility to ensure that the crew was safe

and that the cargo was in good order and condition to be removed. ECF No. 97-6 at 30:9-:21. In particular, Hyman and the other longshoremen were to discharge a certain container and chassis, the rear of which was secured to the deck of the vessel by lashing chains. ECF Nos. 97-2 at 106:19-:25; 97-4 at 66:13-:21.

One of these lashing chains remained affixed to both the chassis and the vessel, as a mule, attached to the front of the chassis, attempted to drive the container forward. ECF Nos. 97-4 at 66:18-67:18; 97-6 at 42:4-:22. When the mule moved forward, the rear lashing chain caused the chassis to slide laterally, pinning Hyman to the bulkhead of the vessel and causing fatal injuries. ECF Nos. 97-2 at 43:3-44:3; 97-4 at 121:14-:22. The lashing chain was not released from the chassis until after the incident. ECF No. 97-6 at 36:5-:14, 43:1-44:6.

Petitioners, the owners and managers of the M/V *Seaboard Spirit*, brought this action for exoneration from or limitation of liability of the claims arising from the May 4, 2011, incident. ECF Nos. 1; 28. Claimants, as representatives of the estate of Ossie Hyman, thereafter filed their Claim against Petitioners for the wrongful death of Ossie Hyman. ECF No. 33. On cross-motions for summary judgment, the Court granted summary judgment in favor of Petitioners and denied Claimants' Motion for Summary Judgment. ECF No. 133. The Court thereafter entered Final Judgment in favor of Petitioners and dismissed Claimants' claims. ECF No. 135. Claimants now move the Court to alter or amend this Final Judgment.[1] ECF No. 136.

---

[1] Petitioners' response to Claimants' Motion does not address the merits of Claimants' arguments but, instead, argues that, on procedural grounds, the Court should not reach the merits of these arguments. *See* ECF No. 139. "The only grounds for granting [a Rule 59] motion are newly-discovered evidence or manifest errors of law or fact." *Arthur v. King*, 500 F.3d 1335, 1343 (11th Cir. 2007) (quoting *In re Kellogg*, 197 F.3d 1116, 1119 (11th Cir. 1999)). Because the Court here concludes that the Order Granting Summary Judgment and the Final Judgment erroneously failed to address the scope of Petitioners' limitation action and certain pieces of evidence that show

## *DISCUSSION*

## I. Limitation of Liability Act

### A. Whether Petitioners are Owners or Owners *Pro Hac Vice* of the Vessel

Claimants assert that the Courts' Order misapplied the provisions of the Limitation of Liability Act, 46 U.S.C. §§ 30501, *et seq.* ("Limitation Act"), under which Petitioners brought their Petition for Exoneration From or Limitation of Liability. *See* ECF No. 136 at 3-9, 18-20. Under the Act, "[t]he owner of a vessel may bring a civil action in a district court of the United States for limitation of liability" up to the value of the vessel and its frieight or the owner's interest in the vessel with respect to maritime incidents that occur without the privity or knowledge of the owner. 46 U.S.C. §§ 30505(b), 30511(a). Thus, the Act serves to limit a vessel's liability when claimants' claims exceed the value of the vessel and its pending freight. *See Lewis v. Lewis & Clark Marine, Inc.*, 531 U.S. 438, 450 (2001). "Congress passed the Limitation Act in 1851 'to encourage ship-building and to induce capitalists to invest money in this branch of industry.'" *Id.* at 446 (quoting *Norwich & N.Y. Transp. Co. v. Wright*, 13 Wall. 104, 121 (1871)).

Limitation of liability under the Act generally applies to the owner of the vessel only. *See id.* § 30505(a) ("the liability of the owner of a vessel . . . shall not exceed the value of the vessel and pending freight."); *id.* § 30512 ("This chapter does not affect the liability of an individual as a master, officer, or seaman, even though the individual is also an owner of the vessel."). But the Act includes in the definition of "owner" "a charterer that mans, supplies, and navigates a vessel at the charterer's own expense or by the charterer's own procurement," commonly referred to as an "owner

---

disputed issues of fact, the Court reaches the merits of Claimants' Motion to Alter or Amend Judgment.

*pro hac vice.*" *Id.* § 30501; *see Thorp v. Hammond*, 79 U.S. 408, 416 (1870) ("the charterer of the vessel, to be employed on his own account, without the management, control, restraint, or possession of the other owners. . . . must be considered as having been the owner '*pro hac vice.*'").

"It is generally said that [§ 30501] carries with it the 'negative implication that except for the owner only the type of charterer who "mans, victuals and navigates" can claim the protection of the Limitation Act.'" *Complaint of Chesapeake Shipping, Inc.*, 778 F. Supp. 153, 155 (S.D.N.Y. 1991) (quoting Gilmore & Black, The Law of Admiralty (2d ed. 1975) at 840). Courts find that vessel managers can be considered owners *pro hac vice* when their responsibilities include "[m]anning the vessels; victualing the vessels, providing for navigation, which involved procuring and providing deck, engine and cabin stores; maintenance and repairs for hull and machinery; providing spare parts, maintenance and repairs for communication and navigation equipment . . . and communicating with [the owner] and the vessels' time charterers." *In re Chesapeake Shipping*, 803 F. Supp. 872, 873-74 (S.D.N.Y. 1992). "Factors such as who pays for storage of the vessel and who skippers the vessel, as well [as] who has possession and control of the vessel, must be taken into account in determining who is an owner for purposes of the Act. Courts also look to the degree of autonomy from the actual owners the managers exercise." *In re Tourtellotte*, No. 09-2787, 2010 WL 5140000, at *2 (D.N.J. Dec. 9, 2010) (internal citations omitted).

Those seeking to invoke the limitation of liability of the Act bear the burden of pleading facts establishing their entitlement to do so. *See Norfolk Dredging Co. v. M/V A/V KASTNER*, 264 F. Supp. 2d 265, 267 (D. Md. 2003) (citing *Petition of E.I. Du Pont De Nemours & Co.*, 18 F.2d 782, 783 (N.D.N.Y. 1926), *aff'd sub nom. E.I. Du Pont De Nemours & Co. v. Bentley*, 19 F.2d 354 (2d Cir. 1927)). Courts deem mere allegations that an entity is a manager of a vessel insufficient to

establish that the entity is an owner *pro hac vice* without allegations that set forth the responsibilities of the manager. *See Tourtellotte*, 2010 WL 5140000, at *3 (court could not yet conclude whether operator was entitled to owner *pro hac vice* status because operator had not alleged that he had authority to make "ultimate decision[s]" regarding the vessel); *Norfolk Dredging*, 264 F. Supp. 2d at 267-68 (quoting *Chesapeake Shipping*, 778 F. Supp. at 157) (dismissing without prejudice complaint of technical manager because complaint "falls short of alleging that variety of responsibilities sufficient to confer upon [the technical manager] . . . [a] limitation of liability").

The Amended Petition alleges that the respective roles of three of the four Petitioners are owner (Seaboard Spirit Ltd.), owner *pro hac vice* (Seaboard Marine Ltd.), and vessel manager (Seaboard Ship Management, Inc.) of the M/V *Seaboard Spirit*. ECF No. 28 at 2, ¶ 2. With respect to Seaboard Marine of Florida, Inc., the Petition alleges that it is a Florida corporation that has been sued by Claimants alleging an ownership interest in the Vessel. *Id.* The Petition does not directly allege whether Seaboard Marine of Florida, Inc., does indeed have an ownership interest in the Vessel. *See id.* Claimants argue that the Court erroneously accepted all Petitioners as owners or owners *pro hac vice* of the Vessel without detailed allegations in the Petition about the respective duties of each of the entities. ECF No. 136 at 18-20.

The Court agrees that limitation of liability cannot be extended to Seaboard Ship Management, Inc., the manager of the Vessel, without facts establishing that its responsibilities and duties warrant owner *pro hac vice* status. In addition, though the Amended Petition avers that in another proceeding Claimants allege that Seaboard Marine of Florida, Inc., has an ownership interest in the Vessel, Petitioners themselves present no allegations or evidence that would indicate whether Seaboard Marine of Florida, Inc., does indeed have an ownership interest in the Vessel. Accordingly,

Petitioners must show cause why Seaboard Ship Management, Inc., and Seaboard Marine of Florida, Inc., should not be dismissed from this limitation action before these particular Petitioners can enjoy the limitation of liability awarded them under the Limitation Act.

B. Whether Petitioners can Limit their Liability as an Onloading Stevedore

Claimants also assert that this Court improperly failed to specify that Petitioners' limitation of liability covers their role as vessel owner only and does not extend to their role as the onloading stevedore that secured the cargo in the Port of Nassau. ECF No. 136 at 7-9. Claimants argue that any limitation of the liability of the Petitioner vessel owners must be viewed in conjunction with the Longshore and Harbor Workers' Compensation Act, 33 U.S.C. §§ 901, *et seq.* ("LHWCA"), the basis of Claimants' cause of action against Petitioners. Because, as Claimants argue, the LHWCA distinguishes between the duties and liabilities of vessel owners and stevedores, Petitioners can only limit their liability under the Limitation Act with respect to their role as vessel owner, and not their role as onloading stevedore.

The LHWCA "establishes a comprehensive federal workers' compensation program that provides longshoremen and their families with medical, disability, and survivor benefits for work-related injuries and death." *Howlett v. Birkdale Shipping Co., S.A.*, 512 U.S. 92, 96 (1994) (citing T. Schoenbaum, Admiralty and Maritime Law § 6-6 (1987); M. Norris, Law of Maritime Personal Injuries §§ 4:11, 4:22-4:29 (4th ed. 1990)). The injured longeshoreman's employer—typically an independent stevedore—must pay benefits at the statutory rate regardless of fault but is shielded from further liability. *Howlett*, 512 U.S. at 96 (citing 33 U.S.C. §§ 904, 905(a)). The injured longshoreman may also seek damages for the negligence of a third-party vessel owner, even if he receives statutory compensation from his employer. *Howlett*, 512 U.S. at 96 (citing *Estate of Cowart*

*v. Nicklos Drilling Co.*, 505 U.S. 469 (1992)).

1972 amendments to the LHWCA effected "fundamental changes" to the nature of an injured longshoreman's right to sue the vessel owner for negligence. *Howlett*, 512 U.S. at 97. Namely, the amendments both abolished the longshoreman's pre-existing right to sue the shipowner based upon the warranty of seaworthiness[2] and also eliminated the employer's obligation to indemnify a shipowner that has been held liable to the longshoreman for breach of the employer's warranty to conduct cargo operations with reasonable safety. *Id.* (citing *Scindia Steam Nav. Co. v. De los Santos*, 451 U.S. 156, 165 (1981); G. Gilmore & C. Black, Law of Admiralty § 6-57, pp. 449-455 (2d ed. 1975)). In addition, the amendments significantly increased the statutory benefits that injured longshoremen are entitled to receive from their employers. *Howlett*, 512 U.S. at 97 (citing *Northeast Marine Terminal Co. v. Caputo*, 432 U.S. 249, 261-262 (1977); Gilmore & Black § 6-46, at 411; Note, 13 Tulane Mar. L.J. 163, 163-164 (1988)). "The design of these changes was to shift more of the responsibility for compensating injured longshoremen to the party best able to prevent injuries: the stevedore-employer." *Howlett*, 512 U.S. at 97 (citing *Scindia*, 451 U.S. at 171).

Thus, the LHWCA establishes a system in which a longhoreman's employer is strictly liable for the injuries of the employee while the vessel owner may also be liable for these injuries but only if found negligent. Though the LHWCA does not itself specify what acts or omissions would constitute a vessel owner's negligence, *see Howlett*, 512 U.S. at 97 (citing *Scindia*, 451 U.S. at 165-

---

[2] A vessel's duty of seaworthiness to its seamen is itself a type of strict liability. *See Gravatt v. City of New York*, 226 F.3d 108, 116 (2d Cir. 2000) (citing H.R. Rep. No. 92-1441, 1972 U.S.C.C.A.N. at 4702; *Scindia Steam Nav. Co. v. De Los Santos*, 451 U.S. 156, 164-65 (1981)) ("Because the responsibility of a vessel to be in seaworthy condition calls for strict liability, regardless of fault, [before the 1972 amendments to the LHWCA] the vessel could be liable to longshoremen, notwithstanding that the unseaworthy condition may have been caused by the stevedore and not by the vessel's crew.").

66), the Supreme Court in *Scindia Steam Navigation Co., Ltd. v. De Los Santos*, 451 U.S. 156 (1981), set forth three general duties that vessel owners owe longshoremen. As the Supreme Court explained,

> The first [duty], which courts have come to call the "turnover duty," relates to the condition of the ship upon the commencement of stevedoring operations. *See* [*Scindia*], at 167, 101 S. Ct., at 1622. The second duty, applicable once stevedoring operations have begun, provides that a shipowner must exercise reasonable care to prevent injuries to longshoremen in areas that remain under the "active control of the vessel." *Ibid.* The third duty, called the "duty to intervene," concerns the vessel's obligations with regard to cargo operations in areas under the principal control of the independent stevedore. *See id.*, at 167-178, 101 S. Ct., at 1622-1623.

*Howlett*, 512 U.S. at 98. Two of these duties apply only after stevedoring operations have begun and the vessel owner has turned over the vessel to the stevedore-employer. After this happens, the vessel owner must both exercise reasonable care to prevent injuries in areas of the vessel that remain under the owner's active control and also intervene in areas that are under the control of the stevedore-employer when the owner has actual knowledge of a hazard and the stevedore-employer is "failing, unreasonably, to protect the longshoremen." *Lampkin v. Liberia Athene Transp. Co., Ltd.*, 823 F.2d 1497, 1501 (11th Cir. 1987) (quoting *Clark v. Bothelho Shipping Corp.*, 784 F.2d 1563, 1565 (11th Cir. 1986)).

Any possible negligence of the vessel owner that arises before turnover of the vessel to stevedoring operations is implicated only under the turnover duty. This duty requires the vessel owner to "'exercise ordinary care under the circumstances' to turn over the ship and its equipment and appliances 'in such condition that an expert and experienced stevedoring contractor, mindful of the dangers he should reasonably expect to encounter, arising from the hazards of the ship's service or otherwise, will be able by the exercise of ordinary care' to carry on cargo operations 'with

reasonable safety to persons and property.'" *Howlett*, 512 U.S. at 98 (quoting *Federal Marine Terminals, Inc. v. Burnside Shipping Co.*, 394 U.S. 404, 416-417 n.18 (1969)). The turnover duty "attaches only to latent hazards, defined in this context as hazards that would be neither obvious to nor anticipated by a competent stevedore in the ordinary course of cargo operations." *Howlett*, 512 U.S. at 99.

A corollary to this duty requires the vessel owner to warn the stevedore "'of any hazards on the ship or with respect to its equipment,' so long as the hazards 'are known to the vessel or should be known to it in the exercise of reasonable care,' and 'would likely be encountered by the stevedore in the course of his cargo operations[,] are not known by the stevedore[,] and would not be obvious to or anticipated by him if reasonably competent in the performance of his work.'" *Howlett*, 512 U.S. at 98-99 (alterations original) (quoting *Federal Marine Terminals*, 394 U.S. at 416-417 n.18). If a vessel does not have actual knowledge of a hazard, the duty to warn attaches "only if the exercise of reasonable care would place upon the shipowner an obligation to inspect for, or discover, the hazard's existence." *Id.* at 100 (citing *Kirsch v. Plovidba*, 971 F.2d 1026, 1029 (3d Cir. 1992)).

Thus, when an offloading longshoreman sues a vessel owner under the LHWCA for an injury whose basis lies in the negligence of an onloading stevedore at a previous port, courts analyze whether any negligence can be ascribed to the vessel owner under its turnover duty. For example, in *Howlett v. Birkdale Shipping Co., S.A.*, 512 U.S. 92 (1994), the vessel owner had provided an independent onloading stevedore at the Port of Guayaquil, Ecuador, with materials such as plastic, paper, plywood, and dunnage to stow cargo that included cocoa beans on its ship. *Id.* at 94-95. The parties in the matter agreed that it was customary to protect cocoa beans with paper or plywood, but stowing cocoa beans with plastic was improper because it tended to aggravate condensation damage

instead of prevent it. *Id.* Nevertheless, the onloading stevedore placed plastic on the tween deck, which was later covered with dirt and debris. *Id.* When the vessel arrived in the Port of Philadelphia, an offloading longshoreman jumped down to the tween deck and slipped on the plastic, sustaining injuries. *Id.*

The offloading longshoreman sued the vessel owner, alleging that it had failed to warn that the tween deck was covered in plastic instead of the ordinary paper or plywood. *Id.* at 99. The *Howlett* Court recognized that the turnover duty covered not only structural defects of the ship but also "certain latent hazards in the cargo stow" because an improper stow is among the latent hazards to which the duty to warn attaches. *Howlett*, 512 U.S. at 99.

But, citing the principle that the stevedore is the party best able to prevent injuries during stevedoring operations, *Howlett* declined to extend the vessel owner's turnover duty to one that requires the owner to make reasonable inspections during and after the stevedoring operations to discover dangerous conditions in the stow. *Howlett v. Birkdale Shipping Co., S.A.*, 512 U.S. at 102-03 ("if, as we held in *Scindia Steam*, a vessel need not supervise or inspect ongoing cargo operations for the benefit of longshoremen then on board, it would make little sense to impose the same obligation for the benefit of longshoremen at subsequent ports."). "[S]hipowners engage a stevedore for its expertise in cargo operations and are entitled to assume that a competent stevedore will be able to identify and cope with defects in the stow." *Howlett*, 512 U.S. at 104 (citing *Scindia*, 451 U.S. at 171; *Hugev v. Dampskisaktieselskabet Intern.*, 170 F. Supp. 601, 608-09 (S.D. Cal. 1959), *aff'd sub nom. Metro. Steve. Co. v. Dampskisaktieselskabet Int.*, 274 F.2d 875 (9th Cir. 1960)). *Howlett* ultimately held that a vessel owner's turnover duty with respect to the cargo stow is a "narrow" duty that attaches only to latent hazards that are known to the vessel or should be known

to it in the exercise of reasonable care. *Howlett*, 512 U.S. at 105 (citing *Scindia*, 451 U.S. at 167).

Under the facts of *Howlett*, the vessel and the onloading stevedore were different entities, so any narrowing of the vessel's duty to supervise onloading stevedoring operation had no effect on a cause of action that an injured offloading longshoreman may have had against the independent onloading stevedore, who, as neither the employer nor the vessel, was not affected by the LHWCA's redistribution of liability. *See Couch v. Cro-Marine Transp., Inc.*, 44 F.3d 319, 326-27 (5th Cir. 1995) (*Scindia* duties do not apply to injured offloading longshoreman's suit against independent onloading stevedore); *see also Norfolk Shipbuilding & Drydock Corp. v. Garris*, 532 U.S. 811, 818-19 (2001) (the LHWCA "expressly preserves all claims against third parties, §§ 933(a), (i). And petitioner is a third party: It neither employed respondent's son nor owned the vessel on which he was killed."). In the instant matter, however, Petitioners acted as both the onloading stevedore and the vessel owner. Thus, the question before the Court is whether Petitioners may limit their liability for their assistance in onloading stevedoring operations under the Limitation Act merely because of their status as vessel owner.

As a preliminary matter, the Court notes that modern judicial perception of the Limitation Act is less than kind. *See Lewis v. Lewis & Clark Marine, Inc.*, 531 U.S. 438, 447 (2001) (quoting 2 T. Schoenbaum, Admiralty and Maritime Law 299 (2d ed. 1994)) ("The Act is not a model of clarity. . . . [and was] badly drafted even by the standards of the time"). On multiple occasions the Eleventh Circuit has labeled the Limitation Act as "hopelessly anachronistic" and has generally warned against the expansion of its reach. *Offshore of the Palm Beaches, Inc. v. Lynch*, 741 F.3d 1251, 1258-59 (11th Cir. 2014) (citing *Hercules Carriers, Inc. v. Claimant State of Fla., Dep't of Transp.*, 768 F.2d 1558, 1564 (11th Cir. 1985); *Univ. of Tex. Med. Branch at Galveston v. United*

*States*, 557 F.2d 438, 441 (5th Cir. 1977))[3] ("We feel no urge to expand in this way a statute our cases deem 'hopelessly anachronistic.'"). It is under this directive to narrowly construe the Limitation Act that the Court analyzes its interplay with the LHWCA.

The protections of the Limitation Act, by its very terms, are available only to vessel owners or owners *pro hac vice*. *See supra.* Accordingly, actions against independent stevedores are not affected by the Act. And while the LHWCA governs the liabilities of employers and third-party vessel owners with respect to injured employee-longshoremen, the LHWCA expressly preserves all claims against other third parties, such as stevedores who neither own the vessel nor employ the injured longshoreman. 33 U.S.C. § 933.

Claimants direct the Court to cases that have considered the liability of defendants who are both employers and vessel owners under the LHWCA. *See Gravatt v. City of New York*, 226 F.3d 108 (2d Cir. 2000); *Morehead v. Atkinson-Kiewit, J/V*, 97 F.3d 603 (1st Cir. 1996); *Grennan v. Crowley Marine Services, Inc.*, No. 05-1504, 2006 WL 623847 (W.D. Wash. Mar. 10, 2006). An employer under the LHWCA must pay no-fault compensation to an injured longshoreman, so it is ordinarily shielded from suit for further damages under the Act. 33 U.S.C. §§ 904; 905(a). But the Act expressly provides that an injured longshoreman "may bring an action against [a] vessel as a third party" for the vessel's negligence. *Id.* § 905(b). In the case of a dual-capacity entity that both employs the longshoremen and owns the vessel, the Act forbids actions "if the injury was caused by the negligence of persons engaged in providing stevedoring services to the vessel." *Id.*

Because, in the case of dual-capacity employer-owners, the LHWCA specifically forbids

---

[3] Decisions of the Fifth Circuit issued prior to October 1, 1981 are binding precedent in the Eleventh Circuit. *Bonner v. City of Prichard*, 661 F.2d 1206, 1207 (11th Cir. 1981).

actions against the employer-owner in its capacity as a stevedore only, the Supreme Court has read the LHWCA to implicitly allow actions against "a vessel owner acting as its own stevedore . . . only for negligence in its 'owner' capacity, not for negligence in its 'stevedore' capacity." *Jones & Laughlin Steel Corp. v. Pfeifer*, 462 U.S. 523, 531 n.6 (1983); *see also Gravatt*, 226 F.3d at 120 (noting that, while the *Jones & Laughlin* quote is technically *dictum*, "this conclusion is the logical result of the text and structure of the statute, and comports with the instruction of the legislative history"). Thus, "[i]nsofar as the employer-vessel is negligent in its stevedore-employer capacity, it is immune from suit under section 905(a). However, insofar as it is negligent in its vessel capacity, it will be liable under section 905(b) in the same manner as a third party." *Gravatt*, 226 F.3d at 120.

Thus, the LHWCA, by its very structure, allows both capacities of an employer-owner to be separately treated under the Act. And as elucidated in *Howlett*, the policy reasons for the LHWCA's redistribution of liability between stevedore and vessel owner are not limited to only those situations in which the stevedore is the injured longshoreman's employer. *See Howlett*, 512 U.S. at 103-105. Regardless of whether the stevedore is the employer of the longshoreman or operates at a previous port of call, the stevedore has increased operational control and access to the cargo stow, so the stevedore is in a better position to prevent injuries during stevedoring operations than the vessel owner. *Id.* at 105. The structure and policy of the LHWCA therefore supports a distinction between Claimants' claims against Petitioners as a vessel owner and their claims against Petitioners as the onloading stevedore.

Moreover, even in light of Congress's intent behind the Limitation Act to induce investment in the ship-building industry, *see Lewis*, 531 U.S. at 446, the Limitation Act applies to vessel owners only and not to stevedores. The Act does not limit stevedores' liability, so the Court cannot presume

that Congress intended the Act to promote the stevedoring industry as it promoted the ship-building industry, even in situations where the stevedoring entity also happens to be a vessel owner.

Thus, in light of the Eleventh Circuit's directive to interpret the Limitation Act narrowly, the Limitation Act's limitation of its applicability to vessel owners only, and the ability of courts to distinguish a dual-capacity entity's duties and liabilities as a vessel owner from its other roles under the LHWCA, it is appropriate to limit Petitioners' liability in this action to their capacity as owners of the *Seaboard Spirit* only. Accordingly, any ruling in this limitation action does not limit any causes of action that Claimants may bring against Petitioners in their roles as onloading stevedores.

## II. Petitioner's Liability As a Vessel Owner Under the LHWCA

### A. Adverse Inference for Failing to Produce Evidence

Claimants next move the Court to reconsider its determination on the motion for summary judgment that Petitioners, as vessel owners, are not liable under their *Scindia* duties. ECF No. 136 at 10-20. As a threshold matter, Claimants revive arguments in their previously filed Motion for an Adverse Inference Due to Petitioner's Failure to Preserve Evidence [ECF No. 96] that summary judgment was inappropriate given Petitioners' failure to preserve certain pieces of evidence. ECF No. 136 at 11-13.

Federal law provides district courts with the power to apply sanctions such as an adverse inference against a party that spoliates evidence. *See Martinez v. Brink's, Inc.*, 171 F. App'x 263, 269 n.7 (11th Cir. 2006). The adverse inference makes a finding or imposes a rebuttable presumption that the missing evidence would have been unfavorable to the party engaging in the misconduct. In the Eleventh Circuit, "an adverse inference is drawn from a party's failure to preserve evidence only when the absence of that evidence is predicated on bad faith." *Bashir v. Amtrak*, 119 F.3d 929, 931

(11th Cir. 1997) (citing *Vick v. Texas Employment Comm'n*, 514 F.2d 734, 737 (5th Cir. 1975)). "Mere negligence" does not sustain an adverse inference against the non-preserving party. *Id.*

Courts in this Circuit are likely to find bad faith where the a party actively spoliated evidence after an opposing party's request to produce that evidence. *See Flury v. Daimler Chrysler Corp.*, 427 F.3d 939, 944-45 (11th Cir. 2005) (bad faith where plaintiff, "fully aware that defendant wished to examine the vehicle . . . ignored the defendant's request and allowed the vehicle to be sold to salvage without notification to defendant"); *Telectron, Inc. v. Overhead Door Corp.*, 116 F.R.D. 107, 133-34 (S.D. Fla. 1987) (bad faith where counsel actively directed the destruction of documents upon receipt of the complaint and request for production). But a court cannot infer bad faith where there is "no probative evidence" that a party "purposely lost or destroyed" a subsequently requested document. *Bashir*, 119 F.3d at 931; *see also Slattery v. Precision Response Corp.*, 167 F. App'x 139, 141 (11th Cir. 2006).

This Court has previously discussed at length the considerations in determining whether bad faith exists on the part of the spoliating party:

> a court may find bad faith based on direct evidence or on circumstantial evidence where certain factors converge. More specifically, where no direct evidence of bad intent exists, in this Circuit, bad faith may be found on circumstantial evidence where all of the following hallmarks are present: (1) evidence once existed that could fairly be supposed to have been material to the proof or defense of a claim at issue in the case; (2) the spoliating party engaged in an affirmative act causing the evidence to be lost; (3) the spoliating party did so while it knew or should have known of its duty to preserve the evidence; and (4) the affirmative act causing the loss cannot be credibly explained as not involving bad faith by the reason proffered by the spoliator.

*F.T.C. v. First Universal Lending, LLC*, 773 F. Supp. 2d 1332, 1353-54 (S.D. Fla. 2011).

Here, Claimants argue that they are entitled to an adverse inference concerning certain

documents requested in September 2012, but Petitioners claim that they are no longer in possession

of these documents after the June 2012 sale of the *Seaboard Spirit*. *See* ECF Nos. 43-1; 96 at 2, ¶

4. The documents requested by Claimants that Petitioners claim to no longer have include an

International Safety Management Code (ISM) Certificate, ISM Safety Management Plans, the

vessel's Certificate of Ownership, the Deck Log Book, Cargo Gear Certificates and Cargo Gear

Inspection Certificates, operating procedures of the *Seaboard Spirit* crew relating to stevedoring

operations, survey or inspection reports, invoices for lashings and other equipment, and any

statements made by the officers and crew of the *Seaboard Spirit* regarding the incident. ECF No. 96

at 2-3. In addition to these documents, Claimants assert that Petitioners have failed to preserve the

chain lashings that Claimants argue may have been defective, though Claimants put forth no

evidence that they requested Petitioners to produce this equipment. ECF Nos. 96 at 10; 136 at 12.

As Claimants argue, it certainly was not prudent for Petitioners to dispossess themselves of

the documents in light of the pending limitation action. Petitioners respond that Claimants had not

requested these documents during the four months of discovery prior to the sale of the vessel. ECF

No. 106 at 3. But the record does not show that Petitioners had communicated to Claimants their

intent to sell the vessel prior to its sale. The first indication in the record that Petitioners had sold the

vessel was filed on August 15, 2012, when Petitioners moved the Court to reduce the security posted

in this limitation action because the sale price of the vessel was $235,000.00 less than the original

appraised value at the time of commencing this action. ECF No. 43. Indeed, Petitioners waited nearly

two months after the June 19, 2012, sale to inform the Court of the sale, even though the Honorable

Jose E. Martinez reissued an Order approving the higher appraised security value just one week after

the sale, on June 27, 2012.[4] ECF No. 38. Petitioners present no evidence that Claimants should have been aware of the sale of the vessel before it occurred, so their argument that Claimants unduly delayed their request for production is unavailing since the production request was made within the prescribed discovery period.

Though Claimants present no direct evidence of bad faith on the part of Petitioners, circumstantial evidence allows for an inference of bad faith. The chain lashings and most of the documents are evidence that is material to Claimants' claims, Petitioners affirmatively dispossessed themselves of this evidence with the sale of the vessel while they should have known of their duty to preserve this evidence, and Petitioners cannot credibly explain why they spoliated the evidence. Thus, it is appropriate for the Court to impose a rebuttable presumption that the missing evidence is unfavorable to Petitioners. *See Fernandez v. Chios Shipping Co., Ltd.*, 542 F.2d 145, 154 (2d Cir. 1976) ("where the injury-causing instrument is not available for inspection at a trial . . . the courts have allowed circumstantial proof to raise permissible inferences of defective manufacture.").

## B. Turnover Duty

Claimants argue that the Court erred by granting summary judgment in favor of Petitioners in finding that the condition of the lever chain binders and the lack of wheel chocks beneath the container did not implicate a breach of their turnover duty under *Scindia*.[5] ECF No. 136 at 10. As

---

[4] This matter was originally before Judge Martinez before being reassigned to me. ECF No. 40.

[5] In addition to the issues of the lashing chain and chocks, Claimants' Motion mentions in passing that the Court should reconsider its finding on the ship's narrow incline ramp. ECF No. 136 at 13-14. But unlike its arguments for reconsideration of the lashing-chain and chock issues, the Motion puts forth no arguments for the Court to reconsider the incline-ramp issue. Accordingly, the Court does not consider the issue of the incline ramp in this Order.

Claimants' Motion for Summary Judgment argued,

> In the instant matter, the Petitioners failed to warn the discharging stevedore that the cargo was not properly secured. The Petitioners used inadequate, dangerous, and/or defective lever chain binders in securing the back of the container/chassis. Furthermore, no lashings were used in the front of the container/chassis.
>
> . . . .
>
> Moreover, no chocks were utilized to secure the tires on the container/chassis involved in the accident, nor were chocks used for the back tires of the white mule. It was the responsibility of the Petitioners to warn the discharging stevedore of these conditions. However, the Petitioners failed to do so. These defects existed from the time of loading in the Port of Nassau and the Petitioners must be deemed to have been aware of these conditions.

ECF No. 97 at 10.

As noted above, a vessel owner's turnover duty with respect to the cargo stow is a "narrow" duty that attaches only to hazards that are (1) latent and (2) known to the vessel or should be known to it in the exercise of reasonable care. *Howlett*, 512 U.S. at 105. The duty does not attach to hazards that are obvious to or anticipated by a competent stevedore at the discharge port. *Id.* at 106.

With respect to the chain lashing, Claimants point to the eyewitness testimony of Deluxe Wise that the chain remaining affixed to the chassis following the incident was "super tight," and the testimony of Claimants' liability expert that "[e]vidently, [the chain binder] did not operate as it is supposed to operate, [it] was either damaged or inadequate." ECF No. 136 at 13-14. Claimants argue that they are entitled to an inference that the chain lashings were defectively tight before the incident, instead of Petitioners being the "beneficiaries" of an inference that the condition of the chain observed after the incident was different than the condition of the chain that existed before the incident. *Id.*

On a motion for summary judgment, the Court views the evidence, including all reasonable inferences drawn from it, in the light most favorable to the non-moving party and resolves all reasonable doubts against the movant. *Rioux v. City of Atlanta, Ga.*, 520 F.3d 1269, 1274 (11th Cir. 2008); *Johnson v. City of Mobile*, 321 F. App'x 826, 830 (11th Cir. 2009). Here, both parties moved for summary judgment on the issue of Petitioners' turnover duty, so neither party is a non-moving party with respect to the issue. *See ECF* Nos. 88 at 7-13; 97 at 9-10. Nevertheless, Claimants are entitled to a rebuttable presumption that evidence spoliated by Petitioners is unfavorable to Petitioners. *See supra.*

Expert Hector Pazos testified that "[e]vidently, [the chain binder] did not operate as it is supposed to operate, [it] was either damaged or inadequate." ECF No. 136 at 13-14. Pazos's deposition indicates that the sole basis for this determination was statements made during interviews with OSHA investigators by longshoremen that they had attempted to remove the lashing chain but could not. ECF No. 97-4 at 95:25-96:9. Pazos's report also states that Pazos reviewed various OSHA documents and that OSHA's interviews with longshoreman indicated that the longshoremen had failed to release the chain prior to the incident because it had too much tension. ECF No. 97-5. The only OSHA report that appears to be in the record does indicate that "during employee interviews it was discovered that one rear chain had too much tension and could not be removed" when the employees were removing all the containers' lashing chains. ECF No. 46-3 at 5.

Victor Vichev, who previously served as Seaboard Marine's representative for one of its agents, testified that the crew of the *Seaboard Spirit* was responsible for securing cargo onto the vessel. ECF No. 97-1 at 16:1-:22. Thus, if the container was, in fact, improperly secured such that one of its lashing chains was too tight, the vessel—which was responsible for the securing of the

cargo—would or should have known about this latent defect. *See Wheelings v. Seatrade Groningen, BV*, 516 F. Supp. 2d 488, 502 (E.D. Pa. 2007) (citing *Howlett*, 512 U.S. at 105-06) ("Certain crew members may hold positions such that their knowledge should be attributed to the vessel.").

Nevertheless, evidence suggests that excessive tension was likely applied to the lashing chain during the course of the incident. Torrence Palmer, the mule driver, testified that once the mule was affixed to the chassis, he drove the mule forward "maybe five inches, maybe six inches" but then felt a "snatch" like something pulling him back. ECF No. 92-4 at 18:6-:12. In addition, Petitioners' expert Eric Sauer testified that video surveillance showed that the mule nose pitched up when the mule attempted to drive forward, indicating that "something was pulling back on the mule instead of the mule stopping itself." ECF no. 94-1 at 42:19-43:9. The parties have put forth no alternative theories of what could have caused the mule and chassis to pull back and, ultimately, shift towards the bulkhead, other than the one lashing chain that remained affixed to the chassis. Presumably, then, the tension on this one lashing chain was great enough to pull back the forward momentum of the mule vehicle and twenty-foot container. *See* ECF No. 92-1 at 44:9-:12. Thus, even if Wise testified that the chain was "super tight" after the incident, it does not necessarily follow that the chain was also "super tight" prior to the incident, given the likelihood that excessive tension was applied to the chain when the mule drove forward during the course of the incident—enough tension to cause the front of the mule to pitch up. Thus, a genuine issue of material fact is in dispute among the parties, so the Court vacates its granting of summary judgment in favor of Petitioners with respect to the issue of the tightness of the lashing chain prior to the incident.

Claimants also argue that summary judgement cannot be granted on the issue of whether or not chocks were used to secure the container's outboard tires because this material issue of fact is

also in dispute. *See* ECF No. 136 at 14-18. Palmer testified that, once the mule was affixed to the chassis, Hyman asked him to back up so that the wheel chocks attached to wheels on the chassis could be removed by hand. ECF No. 92-4 at 11:24-12:8. But Claimants note that lasher Gerald Wilson testified that no chocks were placed on the chassis's wheels on the day of the accident, and Petitioners' expert Eric Sauer testified that, upon review of video surveillance, the movement of the mule when backing up indicated that no chocks had been used. ECF Nos. 94-1 at 41:12-42:11; 97-7 at 25:9-:13, 49:11-51:9. Claimants also point to the report of their expert Rolando Santos, which claims that "testimony, video and surveillance" indicate that no chocks were used to secure the tires of the chassis involved in the incident. ECF No. 97-3 at 1.

Santos's report concluded,

> Primary causation [of the accident] is the lack of use of chocks to properly secure the container/chassis in position by the vessel crew. If these wheel chocks had been in place at the time of the accident we are of the opinion that the mule driver would not have been able to move forward creating the conditions that [led] to the accident that resulted in the death of Mr. Ossie Hyman.

*Id.* at 2. But the same report also stated that, under the proper procedure to remove the container, tire chocks should first be removed before the striker—in this case, Hyman—instructs the mule driver to drive the container forward. *Id.* Thus, as Palmer's testimony suggests, even if chocks were placed on the tires when Palmer attempted to drive forward, and the chocks prevented the forward movement of the mule and container, the longshoreman would not have simply abandoned his attempt to remove the container but, instead, would have removed the chocks and then tried once again to drive the mule forward. So placement of chocks underneath the chassis, by itself, would not necessarily have prevented the accident. Furthermore, the placement of chocks or lack thereof would be obvious to experienced longshoremen who must typically remove chocks during the course of

their removal of containers.

Nevertheless, Santos also separately concludes that "the proper use of wheel chocks would have prevented the (1) chain from becoming mechanically bound which contributed to this accident." *Id.* As Claimants suggest, the use of wheel chocks on containers during the ship's voyage from Nassau to Miami may have prevented "anticipated or expected movement of the container." ECF No. 112 at 1. If, as Claimants argue, no wheel chocks were used during the voyage and this allowed the container to shift during the course of the voyage, it may be possible that unintended shifting of the container during the voyage placed tension and strain on the lashing chain, causing it to become mechanically bound or otherwise too tight to be unlashed at the time of the offloading operations. Thus, though a lack of wheelchocks would be an obvious condition, this obvious condition may nevertheless lead to other hazards that are latent and not commonly encountered by experienced longshoremen. *See Wheelings*, 516 F. Supp. 2d at 503 (denying summary judgment on whether double-twist lock on container was obvious hazard because "[w]hile the double twist lock condition was apparent to [the injured longshoreman], [the plaintiff] has produced testimony that several longshoremen had never before seen a double twist lock condition, and it was not obvious to a competent longshoreman that the condition presented a hazard."). Thus, the Court vacates its granting of summary judgment on the issue of the wheel chocks.

### C. The Active-Control Duty and Duty to Intervene

Claimants ask the Court to alter its judgment that Petitioners did not breach their active-control duty and duty to intervene under *Scindia*. ECF No. 136 at 17. The active-control duty is triggered once stevedoring operations have commenced and requires the shipowner to exercise reasonable care to prevent injuries to longshoremen in areas under the "active control of the vessel."

*Howlett*, 512 U.S. at 98 (quoting *Scindia*, 451 U.S. at 167). Thus, the vessel "may be liable if it actively involves itself in the cargo operations and negligently injures a longshoreman or if it fails to exercise due care to avoid exposing longshoremen to harm from hazards they may encounter in areas, or from equipment, under the active control of the vessel during the stevedoring operation." *Scindia*, 451 U.S. at 167.

Claimants' Motion argues that the active-control duty attached to Petitioners because the Chief Mate or Duty Officer of the *Seaboard Spirit* supervised the cargo operations. ECF No. 111-2 at 56:5-:19. These crew members observe the cargo-discharge operations and contact the ship captain if they see something dangerous. *Id.* But mere supervision or observation of cargo operations by one crew member does not amount to active involvement in those operations.

Nor does the duty to intervene require Petitioners to even supervise the cargo operations. The duty to intervene, like the active-control duty, applies after cargo operations have begun. *Howlett*, 512 U.S. at 98. Unlike the active-control duty, however, this duty "concerns the vessel's obligations with regard to cargo operations in areas under the principal control of the independent stevedore." *Id.* (citing *Scindia*, 451 U.S. at 167-178). *Scindia* explained that "absent contract provision, positive law, or custom to the contrary . . . the shipowner has no general duty by way of supervision or inspection to exercise reasonable care to discover dangerous conditions that develop within the confines of the cargo operations that are assigned to the stevedore." *Scindia*, 451 U.S. at 172. As a result, the shipowner is not liable for "injuries caused by dangers unknown to the owner and about which he had no duty to inform himself" because the shipowner, "within limits, is entitled to rely on the stevedore, and owes no duty to the longshoremen to inspect or supervise the cargo operations." *Id.*

Under the active-control duty, a shipowner may be held liable if it has constructive knowledge of a hazard, but the shipowner must have *actual* knowledge of the hazard to be liable under the duty to intervene. *See Lampkin*, 823 F.2d at 1501. "In such a case, the shipowner has a duty to intervene to protect the longshoremen only if 'it becomes aware that the ship or its gear poses a danger to the longshoremen and that the stevedore is failing, unreasonably, to protect the longshoremen. . . .'" *Id.* (quoting *Clark v. Bothelho Shipping Corp.*, 784 F.2d 1563, 1565 (11th Cir. 1986)). The Eleventh Circuit lists multiple factors that guide a district court's determination about whether a duty to intervene has arisen under the facts of the case: "whether the danger was open and obvious; whether the danger was located within the ship or ship's gear; which party created the danger or used the defective item and was therefore in a better position to correct it; which party owned or controlled the defective item; whether an affirmative act of negligence or acquiescence in the use of the dangerous item occurred; and whether the shipowner assumed any duty with regard to the dangerous item." *Roach v. M/V Aqua Grace*, 857 F.2d 1575, 1582 (11th Cir. 1988) (citing *Casaceli v. Martech Intern., Inc.*, 774 F.2d 1322, 1328 (5th Cir. 1985)).

Petitioners had no duty to supervise the cargo operations, and Claimants present no evidence that Petitioners had actual knowledge of a hazard arising after the ship's turnover nor do they present evidence that Petitioners had become aware that the stevedore was unreasonably failing to protect its longshoremen. Accordingly, Claimants' motion to alter the Court's judgment concerning the active-control duty and duty to intervene is denied.

## CONCLUSION

For the foregoing reasons, it is **ORDERED and ADJUDGED** as follows:

1. Respondents/Claimants' Motion to Alter or Amend Judgment [ECF No. 136] is

**GRANTED IN PART;**

2. The Order Granting Petitioners' Motion for Summary Judgment and Denying Respondents/Claimants' Motion for Summary Judgment [ECF No. 133] and the Final Judgment Dismissing Claimants' Claims Against Petitioners With Prejudice [ECF No. 135] are **VACATED;**

3. The Clerk of Court shall **REOPEN** this matter;

4. Petitioners shall show cause on or before **May 19, 2014,** why Petitioners Seaboard Ship Management, Inc., and Seaboard Marine of Florida, Inc., should not be dismissed from this action in light of the Court's ruling. Failure to timely respond will result in the dismissal of Petitioners Seaboard Ship Management, Inc., and Seaboard Marine of Florida, Inc., from this action;

5. Trial in this matter is reset during the two-week trial period beginning on August 11, 2014. Calendar call will be held at 1:00 p.m. on August 7, 2014, at the United States Federal Building and Courthouse, 299 E. Broward Boulevard, Courtroom 310-B, Fort Lauderdale, Florida;

6. Petitioners' Motion for Summary Judgment [ECF No. 88] is **GRANTED** with respect to their claim that Petitioners did not breach the active-control duty or duty to intervene;

7. This matter shall proceed with respect to Petitioners' turnover duty as the owner of the M/V *Seaboard Spirit* only.

**DONE and ORDERED** at Fort Lauderdale, Florida, this 8th day of May 2014.

ROBIN S. ROSENBAUM
UNITED STATES DISTRICT JUDGE

-25-

Copies to:
The Honorable Barry S. Seltzer
Counsel of record