**UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION**

**CASE NO.: 11-CV-23841-ROSENBERG/BRANNON**

IN RE: M/V SEABOARD SPIRIT, SEABOARD
SPIRIT LTD. as Owner and SEABOARD
MARINE LTD. as Owner Pro Hac Vice of
the M/V SEABOARD SPIRIT for exoneration
from or limitation of liability,

           Petitioners.
_____/

**RESPONDENT/CLAIMANTS' POST-TRIAL PROPOSED FINDINGS
OF FACT AND CONCLUSIONS OF LAW**

     COME NOW, Respondents/Claimants, ANTWON HYMAN and SIESHIA NESHAY REID, as Personal Representatives of the ESTATE OF OSSIE HYMAN, by and through the undersigned counsel, and hereby file their Post-Trial Proposed Findings of Fact and Conclusions of Law:

**FINDINGS OF FACT**

1. This case concerns a fatal accident that occurred on May 4, 2011 on Petitioners' vessel, the M/V SEABOARD SPIRIT, at the Port of Miami.

2. Petitioners filed a Petition for Exoneration from or Limitation of Liability on October 25, 2011 requesting that this Court adjudge that Petitioners are not liable for Mr. Hyman's death, or if found liable, then to limit Petitioners' liability to the value of the M/V SEABOARD SPIRIT. (Doc. 1).

3. Petitioners sought leave of Court and filed their Amended Petition for Exoneration from or Limitation of Liability on March 30, 2012, adding as Petitioners, SEABOARD SHIP MANAGEMENT, INC. and SEABOARD MARINE OF FLORIDA, INC. (Doc. 28).

4. On April 10, 2012, Respondents/Claimants filed their Answer and Affirmative Defenses to the Amended Petition, requesting the Court to deny Petitioners' Amended Petition for Exoneration and Limitation of Liability, and their Amended Claim. (Doc. 32).

5. The crew of the M/V SEABOARD SPIRIT drafted the cargo stowage plan for the voyage from Nassau, Bahamas to Miami, Florida, (VICHEV DEP. 20:9-21; 24:5-8; 72:21-25; 73:1-15).

6. On May 3, 2011 in Nassau, Bahamas, the blue 8-feet wide by 20-feet long container/chassis involved in this accident was stowed on an inclined ramp of the M/V SEABOARD SPIRIT. (TURNER 69:11-13; PAZOS DEP. 88:4-8; SANTOS DEP. 64:6-15; Pazos Report, p. 4).

7. The inclined ramp measured approximately 11 feet and 5 to 7 inches in width including a 1-foot 11-inch walkway. (SAUER 24 19-20; 39:11-14; PAZOS DEP. 89:15-17).

8. On May 3, 2011, Petitioners' crew of the M/V SEABOARD SPIRIT secured the cargo loaded on the vessel in Nassau, Bahamas which included the use of lashing gear on the 20-foot blue container/chassis and the white mule on the inclined ramp. (VICHEV DEP. 16:11).

9. Petitioners' crew of the M/V SEABOARD SPIRIT installed and tensioned the lever chain binders for the blue container/chassis involved in the accident. (Pazos Report, p. 20).

10. Petitioners' crew of the M/V SEABOARD SPIRIT did not utilize chocks underneath the tires of the blue container/chassis involved in the accident. (Sauer trial testimony; Santos trial testimony).

11. There were no other persons or entities contracted or employed to secure the cargo loaded on the vessel in the Bahamas. (VICHEV DEP. 16:1-11).

12. Petitioners did not place lashing gear on the front of the blue container/chassis. (Santos trial testimony).

13. Instead, Petitioners stowed a white mule in front of the blue container/chassis which caused excess tension on the rear lashing gear of the blue container/chassis. (Santos trial testimony).

14. On May 3, 2011, the M/V SEABOARD SPIRIT sailed from Nassau, Bahamas and after a sea passage, arrived at the Port of Miami on May 4, 2011.

15. Ossie Hyman, working for Eller-ITO, was involved in the cargo discharge operations of the vessel in the Port of Miami on May 4, 2011. (TURNER DEP. 5; WISE DEP. 81; PAZOS DEP. 83:1-7).

16. Petitioners' crew of the M/V SEABOARD SPIRIT had full control of the walkway on the inclined ramp. (Pazos Report, p. 5).

17. The work area provided by Petitioners to Eller-ITO's longshoremen in order to discharge the blue container/chassis on the ramp encroached on the 1-foot 11-inch walkway. (Pazos report, p. 5).

18. The area between the blue container/chassis and the bulkhead of the vessel constituted an unreasonably dangerous/unsafe area for discharge operations on Petitioners' vessel. (PAZOS DEP. 58:7-12).

19. This access area was known to be dangerous by the Petitioners. (STEPIEN DEP. 90). Petitioners, however, placed no barricade or other forms of warning for the longshoremen.

20. Because the container/chassis was too large to be stowed on the inclined ramp, the work area for a discharging stevedore was unreasonably narrow.

21. One of the rear lashing chains of the blue container/chassis could not be removed by the discharging longshore gang. (WILSON DEP. 27:19 - 28:1; WISE DEP. 36:1-7; 42:4-8; 43:1-5; 44:4-6; SAUER DEP. 77:1-15; PAZOS 93:10-14; 103:9-12).

22. The rear lashing chain could not be removed because it was tight, malfunctioning, and/or defective. (WISE DEP. 43:1-5; 44:4-6; Pazos Report, p. 6; SANTOS DEP. 63:22-24).

23. The rear lashing which was unable to be removed from the blue container/chassis stowed on the inclined ramp constituted an unreasonably dangerous/unsafe condition.

24. Petitioners controlled the lashing chain gear on its vessel. (TURNER 68:4-16; ALEMANY DEP. 59:23-25; 60:1-18).

25. There was no routine maintenance or inspections of the lashing gear on the vessel. (Exhibit A: MARSHALL DEP. 6:13; Pazos Report, p. 7).

26. There was miscommunication between Torrence Palmer (the mule operator) and Ossie Hyman during discharge operations in the limited work area of the ramp.

27. Testimony reflects that there was no designated spot for Mr. Hyman to stand in order to communicate with Mr. Palmer, the mule operator. The longshoremen are required to

perform their work alongside and around the containers. (WILSON DEP. 35:2-6; WILSON DEP. 48-49; PALMER 22:8-25, 23:1-22, 24, 71, 73:1-2). As per Mr. Palmer, Mr. Hyman was in the safest spot as Mr. Hyman is his "eyes and ears in the back." (PALMER 24:6-9, 71:10-14

28. Eller-Ito Stevedoring Co., L.L.C.'s Basic Procedure for Unlashing when a Unit is loaded on a ramp is as follows:

1. Unlash chains from front first
2. Attach mule to chassis/trailer
3. Unlash sides and rear of unit
4. Remove chocks from wheels (Trial Exhibit 15).

29. When unlashing on the upward side of the ramp to trailer/chassis, all wheel chocks must remain in place until the mule is locked into the container and the brakes are set. (Eller-ITO Stevedoring Co., Basic Procedure Manual, Trial Exhibit 15).

30. Petitioners did not use chocks between the tires of the blue container/chassis to secure it in position on the inclined ramp. (Santos trial testimony; Sauer trial testimony; Wilson trial testimony).

31. Mr. Gerald Wilson, who regularly worked the M/V Seaboard Spirit, testified that chocks were only used on the vessel after Mr. Hyman's accident. (WILSON DEP. 25: 9-13; 49: 11-25; 50: 1-25; 51: 1-5).

32. Torrence Palmer was able to drive the mule forward with the rear lashing chain still attached to the blue container/chassis due to the Petitioners' failure to place chocks between

the tires of the blue container/chassis prior to the voyage from Nassau, Bahamas to the Port of Miami. (Santos trial testimony).

33. As a result of the lack of chocks, the blue container/chassis shifted which pinned Mr. Hyman between the bulkhead of the vessel and the container. (SAUER DEP. 28:9-10; Pazos Report, p. 4).

34. Tension on the one rear lashing chain was so great that the lashing was able to pull back the forward momentum of the mule and 20-foot container.

35. Chocks would have prevented the mule operator from moving forward even if the rear lashing chain was still attached. (Santos trial testimony).

36. The Court finds that there is no dispute among experts as to the necessity of chocks on an inclined ramp.

37. Wheel chocks serve as a physical barrier to prevent a container from going down the ramp because of gravity. (Santos)**.**

38. The M/V SEABOARD SPIRIT's lashing inventory does not show chocks as part of its inventory. (SAUER DEP. 56:17-20; SANTOS DEP. 96:25; 97:1-13).

39. Petitioners' crew of the M/V SEABOARD SPIRIT is responsible for placing wheel chocks. (ALEMANY DEP. 61:10-20; WILSON DEP. 49:24; VICHEV DEP. 16:16-25; 17:1-9; SANTOS 75:21-25; 76:1; Pazos Report, p. 5).

40. Petitioners had actual and/or constructive knowledge of existing dangerous conditions on its vessel prior to, during, and after discharge operations began.

41. Petitioners did not take reasonable steps to determine whether its equipment, including the lashing gear, was safe before turning over the vessel to the discharging stevedores.

42. The malfunctioning/defective lashing gear was a hazard under Petitioners' control.

43. Upon turning over the vessel to the longshoremen for discharge operations, Petitioners failed to warn the longshoremen of hidden defects of which it knew, or should have known. Specifically, Petitioners failed to warn of the deformation, malfunction, and/or danger of the rear lashing chain which were known and/or should have been known by Petitioners. Moreover, Petitioners used malfunctioning/defective/dangerous lever chain binders in securing the rear of the blue container/chassis.

44. The open and obvious conditions confronted by Mr. Hyman include the following: a container/chassis that was not properly secured; no chocks utilized to secure the tires on the blue container/chassis or the back tires of the white mule; a rear lashing chain remaining attached; and an inclined ramp owned and controlled by the Petitioners on which the container/chassis was placed by Petitioners was too narrow for workers to perform required services.

45. If any longshoreman did not perform the job assigned, he would be subject to disciplinary action. (Wilson, Wise and Johnson's trial testimony).

46. The narrow area used to discharge containers/chassis on the inclined ramp between the container/chassis and bulkhead of the vessel including the walkway was a hazard under Petitioners' control as Petitioners' determined which cargo was stowed on the ramp and where on the ramp the cargo was placed.

47. Petitioners' crew prior to sailing from Nassau, Bahamas, did not check the correctness of the securing of the blue container/chassis involved in Mr. Hyman's accident.

48. Petitioners did not inspect securing devices to ensure that the blue container/ chassis remained safely secured throughout the voyage.

49. A contributing and proximate cause of the fatal accident was Petitioners' failure to use chocks to prevent movement of the blue container/chassis which crushed Mr. Hyman.

50. A contributing and proximate cause of the fatal accident was Petitioners' failure to use front lashings to secure the blue container/chassis causing undue tension on the rear lashings.

51. A contributing and proximate cause of the fatal accident was the malfunctioning/defective rear lashing chain which could not be removed.

52. A contributing and proximate cause of the fatal accident was the improper cargo selected for the inclined ramp which created a dangerously narrow work area.

53. Petitioners failed to exercise reasonable care in the performance of loading stevedore duties.

54. Mr. Hyman exercised reasonable care when he performed discharge operations.

55. Mr. Hyman was an expert and experienced stevedore.

56. As to damages, the Court finds that the damages exceed the amount of Limitation Fund.

## CONCLUSIONS OF LAW

1. The Court has personal and subject matter jurisdiction over all parties hereto.

2. Venue is proper with this Honorable Court.

3. The substantive law applicable to the rights and duties of the parties is general maritime law of the United States.

4. The question of vessel owner negligence is to be governed by the provisions of 33 U.S.C.A. § 905(b) of the Longshore and Harbor Workers Compensation Act.

A. **Standard of Care.**

5. Claims subject to the Limitation of Liability Act, 46 U.S.C. §§30501-30512, *et seq.*, "are those arising from...any loss, damage or injury by collision, or any act, matter or thing...without the privity or knowledge of the Owner." 46 U.S.C. §30505(b).

6. The Limitation of Liability Act, 46 U.S.C.§§30501-30512, et seq., and the Scindia duties do not apply when the vessel owner's negligence occurred while acting in its capacity as stevedore. Greenan v. Crowley Marine Servs., No. C05-1504-JCC, 2006 U.S. Dist. LEXIS 14040 (W.D. Wash. Mar. 10, 2006); Gravatt v. City of New York, 226 F.3d 108 (2d Cir. 2000). If the vessel owner's negligence occurred while acting in its capacity as stevedore, then the duty owed by the vessel owner is that of a stevedore under general maritime law.

7. The loading and securing of cargo onto the vessel is a stevedore capacity act.

8. The standard of care of a stevedore is to load and secure cargo in such a way that an expert and experienced stevedore will be able to discharge the cargo with reasonable safety by exercising reasonable care. Couch v. Cro-Marine Transport, Inc., 44 F.3d 319 (5th Cir. 1995).

9. Because Petitioners acted in the dual-capacity as the loading stevedore in Nassau when they negligently secured the blue container/chassis on the M/V SEABOARD SPIRIT, and as owner of the M/V SEABOARD SPIRIT, Petitioners are not entitled to the benefits of the Limitation of Liability Act with respect to their liabilities as loading stevedore and/or as owner of the vessel.

B. **Scindia Turn Over Duty Breached**

10. The Petitioners inadequately secured the cargo on the vessel in Nassau, Bahamas.

11. Petitioners' use of defective/dangerous lever chain binders, failure to use chocks, and its defective/dangerous access ramp for the discharge of the subject container/chassis created hazardous conditions for the discharging longshoremen.

12. Each of the aforementioned hazardous conditions contributed to the blue container/chassis shifting and, thereby, fatally crushing Mr. Hyman.

13. To produce liability on the part of shipowner, acts of negligence or conditions of unseaworthiness must be contributory and proximate cause of accident. Hercules Carriers, Inc. v. State of Fla., 768 F.2d 1558 (11th Cir. 1985). Therefore, having found Petitioners' acts of negligence to have contributed to and proximately caused Mr. Hyman's accident, any negligence on the part of others that may have contributed to Mr. Hyman's accident is not relevant to this proceeding.

14. Through the 1972 Amendments to the Longshore and Harbor Worker's Compensation Act, Congress intended to make the vessel responsible for its own negligence and to insulate the shipowner from liability to the longshoremen for injuries caused by dangers unknown to the owner. Scindia Steam Navigation Co., Ltd. v. De Los Santos, 451 U.S. 156 (1981); Couch v. Cro-Marine Transport, Inc., 44 F.3d 319 (5th Cir. 1995). There are circumstances in which the shipowner has a duty to act where a danger to longshoremen arises from the malfunctioning of the ship's gear being used in cargo operations as the defect existed from the outset and, therefore, petitioner must be deemed to be aware of the condition. Scindia Steam Navigation Co., Ltd. v. De Los Santos, 451 U.S. 156 (1981).

15. A shipowner's turnover duty, which relates to the condition of the ship upon the commencement of stevedoring operations, requires a vessel to exercise ordinary care under the circumstances to turn over the ship and its equipment in such condition that an expert and experienced stevedoring contractor, mindful of the dangers he should reasonably expect to encounter, will be able by the exercise of ordinary care to carry on cargo operations with reasonable safety to persons and property. 33 U.S.C.A. 905(b); Moore v. Angela MV, 353 F.3d 376 (5th Cir. 2003).

16. In a longshoreman's action against shipowners for injury, it is proper for a trial court to instruct the jury that a shipowner is liable because it created or knew of a dangerous condition before it turned over the ship to the stevedore. Ollestad v. Greenville Steamship Corp., 738 F.2d 1049 (9th Cir. 1984).

17. A shipowner's turnover duty extends to warning a stevedore of hazards with respect to its equipment known to the vessel that would likely be encountered by the stevedore and would not be obvious to him. Moore v. Angela MV, 353 F.3d 376 (5th Cir. 2003).

18. This duty to warn can extend to latent hazards in cargo stow. An improper stow can cause injuries to longshoreman and thus is among hazards on ship to which duty to warn attaches. Howlett v. Birkdale Shipping Co., 512 U.S. 92 (1994).

19. Petitioners breached their turnover duty when they failed to warn of the lashing deformation, a latent defect unknown to the discharging longshoremen but known to the vessel or which should have been known to the vessel in the exercise of reasonable care. Howlett v. Birkdale Shipping Co., 512 U.S. 92 (1994).

20. The turnover-duty exception under which a vessel has no duty to warn of dangers that would be obvious to a longshoreman of reasonable competence applies in an LHWCA wrongful death action if the defect causing the injury is open and obvious and one that the longshoreman should have seen, but does not apply if the longshoreman's only alternatives to facing the hazard are unduly impracticable or time-consuming or would force him to leave the job. Moore v. Angela MV, 353 F.3d 376 (5th Cir. 2003).

21. With respect to the ship's duty to turn over ship in safe condition for unloading by longshoremen, there are two components to the rule on open and obvious hazards: when a ship is turned over to the stevedore with an open and obvious hazard which injures a longshoreman, the ship will be liable, first, if avoiding the hazard would be impractical for the longshoreman, or second, if the ship should have known that the longshoremen would confront the hazard. Moore v. Angela MV, 353 F.3d 376 (5th Cir. 2003).

22. Mr. Hyman had no alternative but to confront the hazards that were created by Petitioners other than leaving the job or facing trouble for delaying the work as testified to by Mr. Delux Wise and Mr. Gerald Wilson. Disciplinary action would be brought if a longshoreman didn't carry out his responsibility of the discharge operations.

23. Mr. Hyman did not choose which cargo would be placed on the inclined ramp. That is chosen by the Petitioners and for which Petitioners draft a stowage plan. Mr. Hyman did not get to choose how the cargo selected by Petitioners was secured. That is determined by Petitioners as well. Mr. Hyman did not get to choose how narrow his work area would be for discharging the container. That is determined by Petitioners' selection of cargo on the ramp.

Mr. Hyman had to confront these hazards if he did not want to leave the job or suffer disciplinary action.

24. A shipowner cannot defend a longshoreman's lawsuit on the ground that the longshoreman should have refused to continue working in the face of an obviously dangerous condition; the assumption of risk defense is not available under the Longshore and Harbor Worker's Compensation Act. Scindia Steam Navigation Co., Ltd. v. De Los Santos, 451 U.S. 156 (1981).

25. The Court finds the Kirksey v. Tonghai Mar., 535 F.3d 388 (5th Cir. 2008) upon which the Petitioners rely to support their position that they did not violate the turn over duty to be distinguishable from this case. Kirksey concerned a longshoreman that was injured when a steel coil fell on him during the unloading of the vessel. Unlike our case, the shipowner in Kirksey did not involve the vessel's equipment or anything the vessel furnished at either the loading or discharging ports. Here, the Petitioners' crew secured the cargo on the inclined ramp using the vessel's equipment in Nassau.

26. Based on the evidence, the Court finds that Petitioners breached the turnover duty.

### C. Privity or Knowledge

27. As Respondents/Claimants have satisfied the initial burden of proving negligence against Petitioners, the burden of proof on limitation of liability issue shifts to Petitioners to prove lack of privity or knowledge as to acts of negligence that caused accident. 46 U.S.C.A. § 183(a).

28. Shipowner may be held liable beyond value of ship if it had privity or knowledge before start of voyage of acts of negligence or conditions of unseaworthiness that caused

accident. 46 U.S.C.A. 183(a). <u>Hercules Carriers, Inc. v. State of Fla.</u>, 786 F.2d 1558 (11th Cir. 1985).

29. Privity or knowledge can be established in two ways: a) where the vessel owner had actual knowledge of the negligent acts that contributed to the loss; or b) where a reasonable inspection would have led to the requisite knowledge. <u>In the Matter of Palmer Johnson Savannah, Inc</u>., 1 F.Supp.2d 1377 (S.D. Ga. 1997); <u>Suzuki Orange Park, Inc. v. Shubert</u>, 86 F.3d 1060 (11th Cir. 1996); <u>Hercules Carriers, Inc. v. Claimant State of Florida</u>, 786 F.2d 1558 (11th Cir. 1985); <u>McNeil v. Lehigh Valley R.R.</u>, 387 F.2d 623 (2d Cir. 1967).

30. In a claim for personal injury or death, the privity or knowledge of the master or the owner's superintendent or managing agent, at or before the beginning of the voyage, is imputed to the owner. 46 U.S.C.A. § 30506(e).

31. Pursuant to the Management Agreement between SEABOARD SPIRIT LTD and SEABOARD SHIP MANAGEMENT, nothing shall detract from the authority of the Master of the Vessel on questions affecting the safety of the vessel , its Crew, and any other person or persons for the time being on board the vessel.

32. What the master knew or should have known upon sailing from Nassau as to the cargo on board his vessel and the conditions of its stowage satisfy the privity and knowledge requirement.

33. Petitioners failed to establish the requisite lack of privity or knowledge to maintain their limitation action.

34. Petitioners had actual and/or constructive knowledge since their crew improperly secured the blue container/chassis by one or more of the following means: malfunctioning

lashing gear, lack of chocks on the tires, and secured cargo on the inclined ramp which was not suitable for discharge operations there.

35. Petitioners are unable to limit their liability for injuries where the hazards existed at the start of the voyage especially where the Petitioners' crew actually created the hazards; under the circumstances of this case, the shipowner is charged with knowledge of existence of the defects.  <u>Villers Seafood Co. v. Vest</u>, 813 F.2d 339 (11th Cir. 1987).

D. **<u>Negative Inference</u>**

36. Petitioners failed to preserve material evidence with a culpable state of mind. Petitioners' failure to preserve material evidence warrants an adverse inference that the documents and lashing gear would have shown that: Petitioners did not purchase appropriate lashing gear for use on the inclined ramp, used dangerous and/or defective gear to secure the blue container/chassis involved, did not use chocks to secure the blue container/chassis involved, did not maintain their lashing gear, did not properly inspect their lashing gear, did not periodically inspect the lashing gear prior to and during the voyage from Nassau to Port of Miami, did not adjust the lashing gear during the course of the voyage, did not repair lashing gear, did not remove dangerous and/or defective lashing gear, used lashing gear that was not in good working order, prevented any determination whether the cargo on the M/V SEABOARD SPIRIT had been secured in accordance with the cargo securing manual's instructions and/or directions, and would have established whether any event or occurrence happened on the sea voyage between the Port of Nassau and the Port of Miami which in any way affected the stowage and securing of the cargo on the vessel.

E.        **Conclusion**

Based on the foregoing evidence and legal principles, Petitioners are denied exoneration from and limitation of liability associated with the loss sustained by Respondents/Claimants.

Respectfully submitted,

  /s/Carolyn F. Frank  
Carolyn F. Frank  
Florida Bar No. 91138  
FRIEDMAN, RODMAN & FRANK, P.A.  
3636 West Flagler Street  
Miami, Florida 33135  
Telephone: (305) 448-8585  
Facsimile:  (305) 448-9818  
Email: carolynfrank@comcast.net

and

David F. Pope  
Florida Bar No. 164452  
BANKER LOPEZ GASSLER P.A.  
501 E. Kennedy Boulevard  
Suite 1500  
Tampa, FL 33602  
Telephone: (813) 221-1500  
Facsimile:  (813) 222-3066  
Email: dpope@bankerlopez.com

Attorneys for Respondents/Claimants  
Antwon Hyman and Sieshia Neshay  
Reid, As Personal Representatives  
of the Estate of Ossie Hyman

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on March 6, 2015, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF.  I also certify that the foregoing document is being served this day on all counsel of record identified on the attached Service List in the manner specified, either via transmission of Notices of Electronic Filing generated by CM/ECF or in some other authorized manner for those counsel or parties who are not authorized to electronically receive notices of Electronic Filing.

By: __/s/Carolyn F. Frank_____
Carolyn F. Frank
Florida Bar No. 91138
FRIEDMAN, RODMAN & FRANK, P.A.
3636 West Flagler Street
Miami, Florida 33135
Telephone:  (305) 448-8585
Facsimile:   (305) 448-9818
Email: carolynfrank@comcast.net

## SERVICE LIST

**Robert W. Blanck, Esquire**
**Jonathan Hernandez, Esquire**
BLANCK & COOPER, P.A.
5730 S.W. 74th Street, Suite 700
Miami, FL 33143
Telephone: (305) 663-0177
Facsimile: (305) 663-0146
Email: rblanck@shiplawusa.com
Email: jhernandez@shiplawusa.com
*Attorneys for Petitioners*

**James W. McCready, III, Esquire**
SEIPP & FLICK, LLP
Two Alhambra Plaza, Suite 800
Coral Gables, FL 33134
Telephone: (305) 995-5600
Facsimile: (305) 995-6100
Email: jmcready@seippflick.com
*Attorneys for Respondent/Claimant, Signal Mutual Indemnity Association, Ltd.*

**Jack P. Hill, Esquire**
SEARCY DENNEY SCAROLA
BARNHART & SHIPLEY, P.A.
2139 Palm Beach Lakes Boulevard
West Palm Beach, FL 33409
Telephone: (561) 686-6300
Facsimile: (561) 383-9424
Email: JPH@searcylaw.com
*Attorneys for Respondent/Claimant Willie Hyman*

**David F. Pope, Esquire**
BANKER LOPEZ GASSLER P.A.
501 E. Kennedy Boulevard
Suite 1500
Tampa, FL 33602
Telephone: (813) 221-1500
Facsimile: (813) 222-3066
Email: dpope@bankerlopez.com
*Attorneys for Respondents/Claimants Antwon Hyman and Sieshia Neshay Reid, As Personal Representatives of the Estate of Ossie Hyman*