UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

IN ADMIRALTY

CASE NO. 1:11-CV-23841-ROSENBERG/BRANNON

IN RE: M/V SEABOARD SPIRIT
SEABOARD SPIRIT LTD as Owner and
SEABOARD MARINE LTD as Owner
*PRO HAC VICE* of the M/V SEABOARD SPIRIT
for exoneration from or limitation of liability,

    Petitioners.
_____/

## MEMORANDUM OPINION

In this matter Seaboard Spirit Ltd., the owner of the M/V Seaboard Spirit (hereinafter the "*Seaboard Spirit*"), Seaboard Marine Ltd., the operator and owner *pro hac vice* of the *Seaboard Spirit*, and Seaboard Ship Management, Inc., the vessel manager of the *Seaboard Spirit* (collectively "Petitioners") petitioned for exoneration from and limitation of liability for personal injury and property damages arising from the death of longshoreman Ossie Hyman under the Limitation of Liability Act, 46 U.S.C. §§ 30501, *et seq.* The claims of Mr. Hyman's representatives, Antwon Hyman and Sieshia Neshay Reid ("Claimants"), brought against Petitioners in this limitation action, are governed by 33 U.S.C. § 905(b) of the Longshoremen's and Harbor Workers' Compensation Act. Petitioners will be liable as vessel owners where Claimants demonstrate Petitioners acted negligently, and Petitioners are unable to show that they lacked privity and knowledge. The issues of whether Petitioners were negligent and whether Petitioners had privity or knowledge of that negligence were tried before the Court on February

18, 2015 through February 20, 2015. The parties submitted post-trial proposed findings of fact and conclusions of law on March 6, 2015.

The Court now renders the following findings of fact and conclusions of law pursuant to the requirements of Rule 52 of the Federal Rules of Civil Procedure. To the extent that any findings of fact are conclusions of law, they are adopted as such; to the extent that any conclusions of law are findings of fact, they are so adopted.

## I. BACKGROUND AND PROCEDURAL POSTURE[1]

Petitioners brought this action following an accident which occurred on board the *Seaboard Spirit* in which longshoreman Ossie Hyman sustained fatal injuries. DE 28 ¶ 6. Mr. Hyman was pinned between a cargo container and the ship's bulkhead when the cargo container shifted. Petitioners allege that Mr. Hyman's death was not caused or contributed to by any fault, design, neglect or want of care on the part of Petitioners or the *Seaboard Spirit*. *Id.* ¶ 7. Moreover, Petitioners allege that the incident and resulting loss and/or damages were occasioned or incurred without their privity or knowledge. *Id.* ¶ 8. Accordingly, Petitioners claim exoneration from liability. *Id.* ¶ 11. Alternatively, Petitioners claim the benefit of the limitation of liability provided for in 46 U.S.C. § 30501 *et seq. Id.* Claimants filed a Claim in response to the Petition. DE 33 ¶ 2. Claimants allege that Petitioners were under a duty to exercise reasonable care to turn over a safe vessel, equipment, and work space, so that a competent stevedore could safely perform the required cargo operations, what is referred to as the "turnover duty." *Id.* ¶ 13. At trial, Claimants argued that Petitioners breached their turnover duty by turning over the *Seaboard Spirit* with defective and/or overly-tensioned lashing chains, without wheel chocks, and with the cargo stowed improperly on a ramp.

---

[1] While the Court is not required to set forth the background of this case or its procedural posture under Federal Rule of Civil Procedure 52(a), it believes both are helpful for understanding the findings of fact and conclusions of law.

2

The Court previously entered an Order granting Petitioners' Motion for Summary Judgment, and denying Claimants' Motion for Summary Judgment. *See* DE 133. In that Order, the Court found that Petitioners were entitled to summary judgment on each of the three theories of negligence alleged by Claimants: breach of the turnover duty, the active-control duty, and the duty to intervene. *Id.* at 10–17. Subsequent to the entry of final judgment for Petitioners, *see* DE 135, Claimants filed a Motion to Alter or Amend Judgment, *see* DE 136. The Court entered an Order granting Claimants' Motion to Alter or Amend Judgment in part, vacating its prior Order. The Court's Order granted Petitioner's Motion for Summary Judgment in part. The Motion was denied with respect to the turnover duty, and granted with respect to the active-control duty and the duty to intervene. *See generally* DE 145.

The Court's Order made two other important conclusions. First, it held that "any ruling in this limitation action does not limit any causes of action that Claimants may bring against Petitioners in their roles as onloading stevedores," but rather applies only to Petitioners in their roles as vessel owners. *Id.* at 14. Second, it established a rebuttable presumption that certain missing evidence is unfavorable to Petitioners; the missing evidence consists of an International Safety Management Code (ISM) Certificate, ISM Safety Management Plans, the vessel's Certificate of Ownership, the Deck Log Book, Cargo Gear Certificates and Cargo Gear Inspection Certificates, operating procedures of the *Seaboard Spirit* crew relating to stevedoring operations, survey or inspection reports, invoices for lashings and other equipment, any statements made by the officers and crew of the *Seaboard Spirit* regarding the incident, and the allegedly defective chain lashings. *Id.* at 16–17.

One issue remained unresolved following the Court's Order: whether or not Seaboard Ship Management, Inc. and Seaboard Marine of Florida, Inc. were proper petitioners under the

Limitation Act. Petitioners conceded the point with respect to Seaboard Marine of Florida, Inc., and it was dismissed from the action. *See* DE 158 at 2. With respect to Seaboard Ship Management, Inc., the Court subsequently held that it was a proper petitioner under the Limitation Act and could proceed in the case. *Id.* at 6.

## II.   FINDINGS OF FACT

1.   Claimants began by calling four witnesses: Hector Pazos, Gerald Wilson, Delux Wise, and Rolando Santos. Mr. Pazos and Mr. Santos testified as expert witnesses. Mr. Pazos gave testimony related to the lashing chains and the placement of the cargo container on the ramp, while Mr. Santos testified about the use of chocks. Mr. Wilson and Mr. Wise were working on the *Seaboard Spirit* on the day of the accident. Petitioners called four witnesses as well: Captain David Scruton, Eric Sauer, Alfonso Johnson, and Doug Ewing. Captain Scruton and Mr. Sauer testified as experts. Captain Scruton testified as a rebuttal expert, giving testimony related to lashing chains, the use of chocks, and the placement of the cargo container on the ramp. Mr. Sauer testified as an expert in his field of mechanical engineering and accident reconstruction.[2] Mr. Johnson was the risk manager for Eller-ITO, the stevedoring company which hired the longshoremen (including Mr. Hyman) working on the day of the incident, at the time of the incident, and is currently its safety officer director. Mr. Ewing previously was the vice president of Seaboard Ship Management, and currently works for Seaboard Marine. Both

---

[2] Prior to trial, Petitioners moved to exclude Mr. Pazos's expert testimony (DE 91) and Mr. Santos's expert testimony (DE 90), while Claimants moved to exclude Captain Scruton's expert testimony (DE 95) and Mr. Sauer's expert testimony (DE 94). The Court denied each Motion without prejudice in light of the fact that the trial would be conducted as a bench trial. *See* DE 190, DE 191, DE 194. By those Orders, the parties were given the opportunity to object to the expert's testimony during trial. *Id.* Neither Claimants nor Petitioners made any such objections. Because the Court found each of the experts to be competent in their areas of expertise under Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993), the Court considered the reliability of the experts' testimony in terms of weight and credibility, as opposed to admissibility.

parties submitted deposition designations, which the Court has reviewed in their entirety. The Court only discusses and cites to those depositions it deems relevant.[3]

2. The *Seaboard Spirit* is a "roll-on/roll-off" vessel, also known as a "RORO vessel." (Pazos Test.) A RORO vessel's cargo is rolled onto the ship, and rolled off the ship once the ship reaches its destination; hence, the name. (*Id.*) The majority of RORO vessels carry cargo containers, which sit on wheeled chassis. (*Id.*) Together, the container and chassis are referred to as a trailer. (Wilson Test.)

3. Once a trailer has been rolled into place, it must be secured. (Pazos Test.) In this case, it was the *Seaboard Spirit*'s crew, as opposed to an independent stevedoring company, that secured the cargo after it was loaded in Nassau, the Bahamas. (*Id.*)

4. RORO vessels generally have two ramps: an internal ramp, which goes from the main deck to the weather deck, and a separate ramp which goes from the vessel to the dock. (*Id.*) The cargo container which killed Mr. Hyman was stored on the internal ramp, and from this point forward, any references to a ramp refer to the internal ramp on which this cargo container was stored. (*Id.*)

5. On its starboard side, the ramp is bordered by the vertical longitudinal bulkhead, which comprises part of the *Seaboard Spirit*'s engine room. (*Id.*) Part of the ramp alongside the bulkhead was painted yellow; Mr. Pazos testified that he considered this the "access area," designed to provide access between the main deck and the weather deck for individuals working on the vessel. (*Id.*)

---

[3] Some of the deposition portions cited by the Court in this Memorandum Opinion contain questions to which the parties raised objections. When the Court cites to a deposition transcript, it has considered any objections raised therein and has overruled them (notably, the vast majority of these objections were to form, without any additional context). The Court has cited to objected testimony only a handful of times, and does not believe that exclusion of this evidence would change the outcome in any case.

6. Trucks called "mules" are used to move the containers and their chassis up and down the ramps. (*Id.*) The mules mobilize the trailers by means of the "fifth wheel," a piece of equipment that connects to the trailer's hydraulics via air pressure hoses. (*Id.*)

7. Mr. Hyman was involved in discharging one of the cargo containers from the *Seaboard Spirit* when he was killed. The videos shown at trial recorded the events as they occurred. In describing the outline of events the Court relies on the videos, which are Exhibits 8 and 9,[4] supplemented by the testimony of the witnesses as cited below.

8. On May 4, 2011, Mr. Hyman—by all accounts an experienced longshoreman, *see, e.g.*, Wilson Test.—was acting as the striker for the gang of longshoremen hired by the stevedoring company Eller-ITO to offload the *Seaboard Spirit*'s cargo. (*See* Palmer Dep. Tr. 7:25–8:1) The striker generally is in charge of safety during operations. (Wilson Test.) It is his responsibility to check the cargo and ensure that all the securing gear has been removed. (*Id.*; Wise Test.) The striker also is responsible for giving the mule operator the order to move forward once the securing gear is off. (Wilson Test.) The striker acts as the "eyes and ears" for the longshoremen during discharge operations. (Palmer Dep. Tr. 8:4–21)

9. As indicated by the Basic Longshore/Container/RORO Procedures prepared by Eller-ITO, Exhibit 15,[5] and the testimony of the witnesses, cargo containers stowed on ramps are discharged as follows: (1) lashing chains on the front are unlashed; (2) the mule is attached to the trailer; (3) the side and rear lashing chains are unlashed; and (4) the chocks are removed from the wheels. At that point, the cargo may be discharged.

10. The cargo container that killed Mr. Hyman (which is the only cargo container to which the Court refers in this section) was secured on the ramp. It was kept in place in part by a

---

[4] Unless otherwise indicated, every exhibit cited was filed with the Court as a joint exhibit.
[5] Exhibit 15 was submitted as a joint exhibit. Its author, Alfonso Johnson, testified for Petitioners.

white mule, which testimony indicated belonged to the *Seaboard Spirit*. (*See, e.g.*, Pazos Test.) The white mule was backed out and replaced by a yellow mule belonging to Eller-ITO and operated by Mr. Torrance Palmer. (Palmer Dep. Tr. 6:1–5, 6:17–20)

11. Mr. Hyman can be seen in the videos walking up the ramp via the access area. Mr. Palmer testified that at no point did Mr. Hyman indicate that there was a lashing chain still affixed to the cargo container. (*Id.* at 11:11–13) Nor, according to Mr. Palmer, did Mr. Hyman indicate that there was a problem removing the lashing chains. (*Id.* at 11:14–19) Mr. Hyman asked Mr. Palmer to reverse the mule so that he (Mr. Hyman) could remove the chocks, which he did. (*Id.* at 11:20–12:8) At this point, Mr. Palmer believed that the rear lashing chains had been removed. (*Id.* at 17:12–14)

12. After removing the chocks, Mr. Hyman made a hand signal which Mr. Palmer interpreted as "Okay, you can go." (*Id.* at 17:9–25) When he saw that, Mr. Palmer turned around and asked Mr. Hyman, "Am I good to go?" (*Id.* at 18:1–2) Mr. Palmer heard Mr. Hyman say, "Yes, you're good to go." (*Id.* at 18:2–3) Mr. Wilson also testified that he heard Mr. Hyman tell Mr. Palmer to "pull out." (Wilson Test.)[6]

### A. Stowage of the Cargo Container on the Ramp

13. In this case, as noted, the trailer which killed Mr. Hyman was stowed on a ramp. Claimants argued that stowing rolling stock on the ramp was dangerous, at least where the rolling stock was a trailer of this size.

14. Testimony was elicited at trial that supports this proposition. Mr. Wise testified that it was dangerous to stow trailers on a ramp, and that he had suggested "many times over the years" that it was dangerous to stow cargo on the ramp. (Wise Test.) He was aware of accidents

---

[6] Mr. Pazos testified that he did not believe that Mr. Hyman would have told Mr. Palmer to do this. (Pazos Test.) However, two witnesses—Mr. Palmer and Mr. Wilson—testified that they heard Mr. Hyman give the order to proceed, and no witnesses offered any testimony to the contrary.

7

involving ramps on other *Seaboard Spirit* vessels. (*Id.*) Mr. Pazos testified that trailers were an "improper" type of cargo to stow on ramps, and that he considers this trailer's stowage there the "primary reason" for the accident. (Pazos Test.) Furthermore, Captain Scruton identified the access area of the ramp as a potential danger zone, or pinch point, as it was a walkway between a fixed object (the bulkhead) and a moving object (the trailer). (Scruton Test.)

15.     However, the ramp itself is not inherently dangerous. Captain Scruton testified that he did not consider it unusual for a ship like the *Seaboard Spirit* to stow trailers on a ramp like the one in question. (Scruton Test.) If cargo is secured properly, the ramp is as safe as any other part of the vessel. (*Id.*)

16.     Additionally, Mr. Sauer testified that the lateral shift of the trailer which pinned Mr. Hyman to the bulkhead and killed him was caused solely by the lashing chain that remained attached to the ramp. (Sauer Test.) It was the pull of the mule on the chain, as opposed to the incline of the ramp, that caused the shift. (*Id.*) Mr. Sauer testified that as long as the wheels of his models were touching the ground, the forces remained the same in proportion; whether the surface on which the trailer sat was flat or inclined was irrelevant. (*Id.*) In summary, Mr. Sauer testified that it was his opinion, within a reasonable degree of certainty, that the incline of the ramp made no difference to the outcome. (*Id.*)

17.     Finally, the Court found persuasive the testimony of witnesses who testified that Mr. Hyman did not have to be standing in the pinch point to communicate with Mr. Palmer. Captain Scruton identified at least two positions in which Mr. Hyman could have stood and still communicated with Mr. Palmer: by the mule that Mr. Palmer was operating, or further behind the container, to the top of the ramp. (Scruton Test.) Mr. Wise testified by deposition that when he acts as the striker, he either stands at the front of the truck with the mule operator to give the

order to proceed, or he stands at the back of the container in a safe spot and gives the order via hand signals.[7] (Wise Dep. Tr. 20:24–21:19; *see also* Wise Test.) Mr. Alemany, a stevedore supervisor for Eller-ITO who was present and supervising operations on the day of the incident, testified that the only safe place for Mr. Hyman to be, under the circumstances, was clear of the container. (Alemany Dep. Tr. 4:7–24, 5:17–22, 19:24–20:17)

18.     Other witnesses testified in more general terms about this issue. Mr. Turner testified that he did not know why Mr. Hyman was standing where he was at the time of the incident. (Turner Dep. Tr. 28:8–13) Mr. Palmer originally testified that Mr. Hyman was standing in "the only logical place" at the time, as it was only from that vantage point that Mr. Hyman could see everything that was occurring. (Palmer Dep. Tr. 22:8–23:2, 72:21–73:3) When pressed, however, Mr. Palmer admitted that he could not explain why Mr. Hyman could not have moved behind him, out of harm's way, before giving the order to proceed. (*Id.* at 73:8–21) Mr. Wilson testified by deposition that he, personally, would not have stood where Mr. Hyman was standing when the mule driver is about to start operating. (Wilson Dep. Tr. 34:6–11)

19.     For these reasons, the Court finds that the stowage of the cargo container on the ramp was not a proximate cause of Mr. Hyman's death.

   **B.     Lashing Chains**

20.     Cargo containers on RORO vessels are generally secured, at least in part, by lashing chains. (Wilson Test.) It is the responsibility of longshoremen working as "cut loose" men to remove the lashing chains securing the cargo. (*Id.*) Sometimes, the chains are too tight to remove manually. (*Id.*) When this occurs, the tension in the chains must be relieved before they can be removed. (*Id.*) This may be accomplished using a mule. (*Id.*) The mule will raise the front

---

[7] Mr. Wise also testified that there was not necessarily anything wrong with where Mr. Hyman was standing, depending on the context. (Wise Dep. Tr. 62:11–24)

end of the container, causing the lashing chains on the back to go slack. (*Id.*) The chains are then loose enough for the longshoremen to remove. (*Id.*) This is considered a standard industry practice. (Pazos Test.) Alternatively, a simple pipe or "cheater bar" can be used to loosen the lashing chains. (*Id.*)

21. Claimants argued that the lashing used to secure the container which killed Mr. Hyman was defective and/or overly tensioned. As noted above, Claimants are entitled to an adverse inference on this point, and the Court assumes that the lashings were too tight (the only "defect" suggested), and consequently were difficult or impossible to remove manually. Moreover, the Court heard credible testimony suggesting the same. (*See* Wilson Test.; Wise Test.)

22. Although the chains on that container could not be removed manually, they were able to be removed using a mule. Mr. Wilson was working on the *Seaboard Spirit* on the day of the incident, and he testified that he helped remove the chains on the container that fatally injured Mr. Hyman after the incident occurred. (*Id.*) He testified that the chains on the container were tight, and had to be loosened before they could be removed. (*Id.*) This was accomplished by having the mule raise the front of the container, which was the standard procedure. (*Id.*) Mr. Wise also testified that a mule was used to remove the chain. (Wise Test.) The Court found Mr. Wilson and Mr. Wise credible, and no witness testified that the container was not removed, or that some extraordinary measures were used to take off the chains.

23. The Court finds that the lashing chains played a role in the accident. Mr. Sauer testified that the lateral shift of the container which killed Mr. Hyman was caused by the fact that only one of the two rear lashing chains was still in place when the mule pulled the cargo

container forward. (Sauer Test.) The Court found his testimony credible, given his background and experience.

24. The Court finds that the overly-tight lashing chain was not a proximate cause of Mr. Hyman's death. As indicated by the fact that longshoremen were subsequently able to remove the lashing chain, the chain was not impossible to remove. Whether or not the lashing chains were in place would have been readily apparent, and it was Mr. Hyman's responsibility to ensure they were removed. (Pazos Test.; Turner Dep. Tr. 12:21–24) Mr. Pazos testified that it was "common sense" to remove the lashing chains prior to ordering the mule to move the container itself. (Pazos Test.; *see also* Santos Test.; Scruton Test.) There is nothing to indicate that Mr. Hyman, who was the striker and had the responsibility of ensuring the securing gear was removed before the mule moved forward, did not have the opportunity to check the rear of the container and remove the lashing chain before ordering Mr. Palmer to move the mule.

25. Moreover, had Mr. Hyman concluded that there was a problem with the lashing chains, he had the option to stop the work. Every longshoreman has what is referred to as "stop work authority," which means that when *any* longshoreman—not just a senior longshoreman, or a longshoreman holding a certain position—sees a hazard, he or she has the authority to stop all operations until the unsafe condition is remedied. (Santos Test.; Johnson Test.) Mr. Johnson emphasized that Eller-ITO, the stevedoring company which hired Mr. Hyman on the day of the incident, would not require the longshoremen to work in unsafe conditions. (Johnson Test.) The Court heard no testimony to the effect that Mr. Hyman would have been penalized for stopping the work to remedy any deficiency with respect to the lashing chains.

### C. Chocks

26. "Chocks" are instruments put on the wheels of a trailer to keep it from moving. (Wilson Test.) They are one of the means by which rolling stock, such as the trailer at issue in this case, is secured on a RORO vessel. (Santos Test.) The chocks act as a physical barrier to movement, and are critical in instances where, *e.g.*, the air brakes fail. (*Id.*) They are removed last, after both the trailer stand and lashing chains have been removed. (*Id.*; Scruton Test.) As. Mr. Santos testified, they are "first on, last off," and must be removed before the order to move the trailer is given. (Santos Test.)

27. Claimants argued that Petitioners' failure to chock the wheels was a proximate cause of the accident. It was undisputed at trial and in the depositions that had the wheels been chocked at the time that Mr. Hyman gave Mr. Palmer the order to move the mule, the accident would not have occurred. (*See, e.g.*, Wilson Test.)

28. There was testimony from multiple witnesses as to whether or not chocks were in place on the day of the accident. Mr. Wilson testified that the wheels were "never" chocked on the *Seaboard Spirit*, and that he complained to the header about it on a number of occasions. (Wilson Test.) Mr. Wilson also testified that at the time of Mr. Hyman's accident the wheels were not chocked, and that the *Seaboard Spirit* began chocking the wheels after the accident. (*Id.*) Mr. Sauer testified that in his experiments, the incident would not have occurred in the way it did if chocks remained on the wheels, leading him to conclude that there were not chocks on the wheels at the time of the incident. (Sauer Test.)

29. Contrary to the above, Mr. Wise testified that there was at least one chock in place, and that it was on the rear wheel of the container which struck Mr. Hyman. (Wise Test.) He did not recall seeing chocks on any of the other five wheels. (*Id.*) Mr. Palmer, who was

operating the mule and was closest in proximity to the accident, testified by deposition that Mr. Hyman asked him to back the mule up so he could remove chocks on the wheels of the container, which Mr. Hyman then did. (Palmer Dep. Tr. 11:20–12:8, 16:4–13) Mr. Palmer saw Mr. Hyman remove at least one chock from the wheels. (*Id.* at 28:13–29:8) Mr. Turner testified by deposition that there were chocks on board the deck, although he was not able to identify the ones used on the trailer involved in the incident and he admitted that he did not have any personal knowledge as to whether chocks had been removed from the trailer at the time of the incident. (Turner Dep. Tr. 32:10–20)

30. The Court finds that Petitioners' failure to chock the wheels was not a proximate cause of Mr. Hyman's death. Whether or not Petitioners chocked the wheels, it is undisputed that at the time of the accident no chocks were in place—either because Petitioners did not use them, or because Mr. Hyman himself removed them. Either way, it was Mr. Hyman's responsibility as striker to remove them, and he certainly would have noticed their absence. (Wilson Test.; *see also* Scruton Test.) Moreover, the Court heard testimony that the absence of chocks would have been apparent to an experienced longshoreman like Mr. Hyman. (Wilson Test.)

31. Had Mr. Hyman noticed the chocks' absence, and had he believed their absence a danger, Mr. Hyman had options to resolve the issue. For example, he could have stopped work on the vessel until the chocks were put in place. Even if there were no chocks at all on the vessel as Claimants suggested (*see, e.g.*, Santos Test.), Mr. Hyman, at a minimum, could have moved out of the pinch point before giving Mr. Palmer the order to move the mule.

### D. Proximate Cause of Mr. Hyman's Death

32. In summary, the Court finds that the proximate cause of Mr. Hyman's death was not the stowage of the cargo on the ramp, a defective lashing chain, or the absence of chocks. It

was Mr. Hyman's decision to position himself in the pinch point when giving Mr. Palmer the order to move forward—a decision which even his fellow longshoremen found inexplicable—that caused his death. Alternatively, if the Court assumes, contrary to both Mr. Palmer's and Mr. Wilson's testimony, that Mr. Hyman did not tell Mr. Palmer to proceed, it was some miscommunication between Mr. Palmer and Mr. Hyman, coupled with Mr. Hyman's position in the pinch point, that caused Mr. Hyman's death.

### III. CONCLUSIONS OF LAW

1. This Court has jurisdiction over this matter pursuant to 46 U.S.C. §§ 30501, *et seq.*, the Limitation of Liability Act ("Limitation Act"), 28 U.S.C. § 1333, providing jurisdiction for admiralty and maritime cases, and 33 U.S.C. § 905, the Longshoremen's and Harbor Workers' Compensation Act (LHWCA). Venue is proper in this district. 28 U.S.C. § 1391.

2. Under the Limitation Act, "[t]he owner of a vessel may bring a civil action in a district court of the United States for limitation of liability" up to the value of the vessel and its freight or the owner's interest in the vessel with respect to maritime incidents that occur without the privity or knowledge of the owner. 46 U.S.C. §§ 30505(b), 30511(a). Thus, the Act serves to limit a vessel's liability when claimants' claims exceed the value of the vessel and its pending freight. *See Lewis v. Lewis & Clark Marine, Inc.*, 531 U.S. 438, 450 (2001).

3. By this Court's prior Orders, all Petitioners remaining in the case qualify as owners of the *Seaboard Spirit* under the Limitation Act. *See* DE 145, DE 158. The Court reiterates its holding in prior opinions, namely that "any ruling in this limitation action does not limit any causes of action that Claimants may bring against Petitioners in their roles as onloading stevedores," but instead applies solely to claims brought against Petitioners in their capacity as owners of the *Seaboard Spirit*. DE 145 at 14.

4. The strictures of the Limitation Act are viewed alongside the LHWCA, the basis of Claimants' cause of action against Petitioners. The LHWCA "establishes a comprehensive federal workers' compensation program that provides longshoremen and their families with medical, disability, and survivor benefits for work-related injuries and death." *Howlett v. Birkdale Shipping Co., S.A.*, 512 U.S. 92, 96 (1994). Claimants are proceeding under 33 U.S.C. § 905(b) of the LHWCA, which allows for negligence actions against vessel owners "[i]n the event of injury to a person covered under [the LHWCA]."

5. Claimants bear the initial burden of showing that Ossie Hyman's death was caused at least in part by the negligence of Petitioners. If shown, the burden then shifts to Petitioners to show lack of privity or knowledge of such negligence. *See Hercules Carriers, Inc. v. Claimant State of Fla., Dep't of Transp.*, 768 F.2d 1558, 1563–64 (11th Cir. 1985). If there is no evidence of Petitioners' negligence or contributory fault, then Petitioners are entitled to exoneration from all liability. *In re Complaint of Royal Carribean Cruises Ltd.*, 459 F. Supp. 2d 1284, 1288 (S.D. Fla. 2006) (citing *Am. Dredging Co. v. Lambert*, 81 F.3d 127, 129 (11th Cir. 1996)).

6. Vessel owners such as Petitioners owe three duties to longshoremen that work on their ships. *See generally Scindia Steam Navigation Co., Ltd. v. De Los Santos*, 451 U.S. 156 (1981). "The first [duty], which courts have come to call the 'turnover duty,' relates to the condition of the ship upon the commencement of stevedoring operations." *Howlett*, 512 U.S. at 98 (citing *Scindia*, 451 U.S. at 167). "The second duty, applicable once stevedoring operations have begun, provides that a shipowner must exercise reasonable care to prevent injuries to longshoremen in areas that remain under the 'active control of the vessel.'" *Id.* (citing *Scindia*, 451 U.S. at 167). "The third duty, called the 'duty to intervene,' concerns the vessel's obligations

with regard to cargo operations in areas under the principal control of the independent stevedore." *Id.* (citing *Scindia*, 451 U.S. at 167–78).

7. The Court previously granted summary judgment in favor of Petitioners as to Claimants' allegations that Petitioners violated the active-control duty and the duty to intervene. DE 145 at 24. Thus, Petitioners may only be liable if they are found to have breached the turnover duty.

8. Claimants argued at trial that Petitioners breached the turnover duty in three respects: (1) by using defective lashing chains to secure the subject container/chassis; (2) by failing to use chocks to secure the subject container/chassis; and (3) by stowing the subject container/chassis on a ramp. Each of Claimants' arguments for breach of the turnover duty pertains to Petitioners' stowage of the cargo containers.

9. "[T]he vessel's turnover duty to warn of latent defects in the cargo stow and cargo area is a narrow one. The duty attaches only to *latent* hazards, defined as hazards that are not known to the stevedore and that would be neither obvious to nor anticipated by a skilled stevedore in the competent performance of its work." *Howlett*, 512 U.S. at 105 (citing *Scindia*, 451 U.S. at 167) (emphasis added). Consequently, a vessel owner has a duty to warn the stevedore only "of any hazards on the ship or with respect to its equipment . . . that are not known by the stevedore and would not be obvious to or anticipated by him if reasonably competent in the performance of his work," *see Scindia*, 451 U.S. at 167, what this Court hereinafter refers to as the "open and obvious" exception to the vessel owners' duty to warn.

10. Some courts, although neither the Eleventh Circuit nor the Supreme Court, have held that this "open and obvious" exception to the vessel owner's duty does not apply "if the longshoreman's only alternatives to facing the hazard are unduly impracticable or time-

16

consuming and would force him to leave the job." *Moore v. M/V Angela*, 353 F.3d 376, 381 (5th Cir. 2003); *see also Hill v. Reederei F. Laeisz G.M.B.H., Rostock*, 435 F.3d 404, 409 (3d Cir. 2006) ("When a ship is turned over to the stevedore with an open and obvious hazard which injures a longshoreman, the ship will be liable, first, if avoiding the hazard would be impractical for the longshoreman, or second, if the ship should have known that the longshoremen would confront the hazard.").

11.     Claimants conceded in their closing that each of the hazards they cited as a breach of the turnover duty—the allegedly defective lashing chains, the failure to use chocks, and the placement of the cargo container on the ramp—was an open and obvious condition of which a reasonably competent longshoreman, which Mr. Hyman undoubtedly was, would have been aware. Consequently, they can only succeed in showing Petitioners' negligence if (1) this Court finds the exception to the "open and obvious" exception applies; and (2) it would have been impractical for Mr. Hyman to avoid the hazard and/or the vessel owner should have known that Mr. Hyman would confront the hazard.

12.     First, the Court declines to recognize the exception to the exception put forth by Claimants where the Supreme Court clearly has stated that the turnover duty with respect to cargo stow "attaches only to *latent* hazards, defined as hazards that are not known to the stevedore and that would be neither obvious to nor anticipated by a skilled stevedore in the competent performance of its work." *Howlett*, 512 U.S. at 105 (citing *Scindia*, 451 U.S. at 167) (emphasis added). As none of the hazards cited by Claimants were latent hazards, by Claimants' own admission, Petitioners did not breach the turnover duty and consequently are entitled to exoneration from liability.

17

13. Second, and in the alternative, the Court concludes that even if it were to find an exception to the exception, Claimants have not met their burden to show that it was impractical for Mr. Hyman to avoid the conditions they identified as hazards, and/or that Petitioners should have known that he would confront those hazards. Petitioners would be entitled to exoneration under this standard as well.

14. As the Court found above, Mr. Hyman, while standing in the access area of the ramp, gave Mr. Palmer a verbal command. The Court does not need to determine what was said to absolve Petitioners of liability. Assuming that Mr. Hyman told Mr. Palmer to proceed, as both Mr. Palmer and Mr. Wilson testified, the Court heard no testimony to explain why Mr. Hyman could not simply have walked down the ramp to the mule, out of harm's way, to give the command.

15. If Mr. Hyman gave Mr. Palmer a different command—perhaps he was trying to tell Mr. Palmer to raise the container so the chain could be cut, *see* Santos Test. (suggesting that a longshoreman could take such action prior to removing the chocks), Alemany Dep. Tr. 19:2–9 (stating that such action might be taken at this juncture to loosen the chains)—and Mr. Palmer misheard him, the result is no different. The pinch point was an area known to be dangerous when mules were moving cargo down the ramp, and Mr. Hyman nonetheless stood in this area when giving an order to the mule operator. The hazards which Claimants argue that Mr. Hyman was confronting, or could not have avoided—a tight lashing chain, the absence of chocks, and the stowage of the cargo container on the ramp—were not the proximate cause of his death. Rather, and as discussed at length in the Findings of Fact above, it was Mr. Hyman's decision to give an order to the mule operator while positioned in the pinch point, an area known to be dangerous with moving cargo, which resulted in his death.

16. Because the Court concludes that Claimants have failed to demonstrate Petitioners' negligence, it need not address whether or not Petitioners had privity or knowledge.

## IV. CONCLUSION

For all of the reasons set forth above, the Court finds in favor of Petitioners. The Clerk of the Court is **DIRECTED** to enter **FINAL JUDGMENT** in Petitioners' favor.[8] The Court retains jurisdiction over the parties and this cause to enforce all provisions of this opinion and provide additional relief as justified. The Clerk of the Court is **DIRECTED** to **CLOSE THIS CASE**. All pending deadlines are **TERMINATED** and all pending motions are **DENIED AS MOOT**.

**DONE AND ORDERED** in Chambers, Fort Pierce, Florida, this 14th day of April, 2015.

Copies furnished to:  
Counsel of record

ROBIN L. ROSENBERG  
UNITED STATES DISTRICT JUDGE

---

[8] For the reasons discussed in this Court's prior Order of May 8, 2014, this ruling does not limit any causes of action that Claimants may bring against Petitioners in their roles as onloading stevedores. See DE 145 at 6–14.